## LESLIE GRAY et al., By Their Guardian, ELLA GRAY, Appellants, v. E. A. EARLS and ED. STOUT.

### Division One, April 6, 1923.

1. **ASSAULT: Damages: Unlawful Shooting: Negligence: Pleading.** A petition charging a wrongful shooting of plaintiffs' father by defendants and that his death was caused by their wrongful and unlawful acts, and failing to charge negligence, can be construed only as charging an unlawful shooting, as distinguished from a mere negligent shooting. The intentional shooting of a man, whom defendants were assuming the right to arrest for a completed offense less than a felony, but of whose connection with the offense they were at the time uncertain and in fact mistaken, involves something graver than mere negligence or carelessness. [Distinguishing McLaughlin v. Marlatt, 296 Mo. 656, and Conway v. Elder, 66 Mo. 346.]

2. ———: **Authority to Arrest Thief: Completed Offense.** The statute (Sec. 3387, R. S. 1919) authorizing the owner or person in possession, without a warrant, to arrest "any person found in the actual perpetration of the offense of wilfully and maliciously, or wantonly and without right, entering the premises of another and taking and carrying away grain being or growing thereon, does not authorize such owner or possessor to arrest a person who has stolen a sack of corn from a field and carried it to his near-by cabin, the offense not being committed in his presence, nor the offender found in the actual perpetration of it. No statute authorizes a private person to make arrests in such circumstances.

3. ———: ———: ———: **Disclosure of Purpose to Arrest.** Even an officer must make a reasonable disclosure, adapted to the circumstances, of his character, and of his purpose to arrest a person suspected of having committed a completed misdemeanor, and to make it to the person against whom he is expecting to act, and private citizens owe at least an equal duty to such person.

4. ———: ———: ———: **Shooting Another.** The defendants, the deceased and one Hannah owned crops standing in one enclosed field adjacent to the cabin of a negro who had been stealing their corn. On the night before the fatal shooting they had heard the negro pulling corn from deceased's field, and later heard sounds as of a sack being thrown down and the feeding of hogs, and heard near the pen the sound of talking, and deceased said it was the negro and another living nearby. They agreed to meet at the same place the next night, and Hannah and the two defendants,

Gray v. Earls.

all armed with shotguns, went to the place, which was in the field of one of the defendants, but for some reason deceased did not join them there, but went unarmed into his own field to watch for the negro. The three others watched for the negro from a point not far from his cabin, and not far from deceased's field. The negro went towards deceased's field, and they heard a sound as of some one pulling corn, and later they heard sounds from the negro's hog pen, as of corn being thrown down and of hogs being fed, and they moved towards the pen. The night was very dark, but they saw the forms of two men. The negro was nearest Hannah, who advanced quickly, pointed his gun at him and, calling him by name, told him to throw up his hands, which he promptly did, saying, "They are up, Mr. Hannah." One of the defendants was nearest deceased, who was standing several feet from the negro, or walking slowly towards defendants, who, moving up, presented their guns at him, and called out to him three or four times to throw up his hands, and when he failed to do so one of them shot him, and immediately the other did also. Deceased was not armed, said nothing, made no resistance, and did nothing at all except to walk "sidling" towards the negro's cabin. They gave him no notice of their identity or purpose other than the demand to hold up his hands. *Held*, that the offense of the negro being completed and of a degree below a felony, the defendants had no authority to arrest him, and their act in shooting deceased was a wanton disregard of their duty to disclose their character and purpose, and was not mere negligence, but unlawful and intentional.

5. ———: ———: **Pleading: Intentional Shooting.** A charge that the shooting of deceased was an "unlawful act" should be construed as a charge that is was "intentionally" done, since a wrongful act necessarily includes malice in its legal sense, which does not imply personal ill-will towards the party injured, but may imply wantonness or reckless disregard of the rights of others.

6. ———: ———: **Self-Defense.** And in an action for damages for shooting deceased under the circumstances of this case, the court should give an instruction for plaintiffs telling the jury that the finding cannot be for defendants upon their plea of self-defense.

7. ———: ———: **Instruction: Misleading.** Where defendants saw, heard or spoke of only one negro as stealing corn, an instruction using the plural number throughout, and telling the jury, in effect, that though the person actually shot was not stealing corn, the defendants had a right to arrest both of them, and for a misdemeanor, and embodying a command upon deceased to consider himself under arrect, when defendants used no such language, is misleading and erroneous.

8. ———: ———: ———: Apprehension of Danger: Unfair and Confusing. An instruction telling the jury that defendants were not compelled to "stand with arms folded until it was too late to strike" and that if defendants had reasonable cause to apprehend immediate danger from deceased, whom they thought to be a negro thief, they had a right to act upon appearances and kill him, is unfair, prejudicial and confusing, where defendants, assuming authority, without a warrant, to arrest a negro thief for a completed misdemeanor, on a dark night shot deceased, supposing him to be a negro thief, at a time when, standing near the negro, he said no word and made no gesture. Said instruction is not based on the actual situation, is supported by no evidence, and is not applicable to a shooting under such circumstances.

9. ———: ———: ———: Assumption of Facts and Law. An instruction which assumes the existence of facts which the evidence does not establish or contains unwarranted assumptions of law justifying defendants' unlawful acts, is erroneous, because misleading and confusing.

10. ———: ———: ———: Reputation of Thief: Applied to Bystander. One of the defendants testified that before he shot deceased, he heard Hannah, who had accompanied them, call out to the negro thief, by name, to hold up his hands, and the negro's reply, "They are up, Mr. Hannah," and that he knew the negro. Thereupon he called out to deceased, who stood near by and was slowly moving towards the negro's cabin, to throw up his hands, and when he failed to do so, he shot him, and the other defendant shot him immediately afterwards. In the dark they thought deceased was a negro thief, but do not claim that he had any arms about him, but that they feared he would go into the thief's cabin twenty feet away and afterwards shoot them, and they make no showing they they acted in self-defense. *Held*, in a civil action for damages, that an instruction that in judging of the appearance of deceased, the defendants could take into consideration the reputation of the negro, was erroneous, and for the same reason the testimony concerning the bad reputation of the negro, whose offense was complete and was a misdemeanor, should have been excluded.

11. ———: Evidence: Collection of Accident Insurance. In an action for damages, brought by children, in the name of their mother as guardian for the unlawful killing of their father, the admission of testimony that the mother collected an accident insurance policy issued to deceased and naming her as sole benefiiary, is error.

12. ———: ———: Why Defendants Shot Deceased. In an action for damages brought by children for the unlawful shooting of their

father, defendants should not be permitted to testify why they fired, or what they thought the deceased was going to do, or what their apprehensions were. Such conclusions have no place in a civil suit for damages.

13. ———: ———: Preliminary Hearing: Mother's Wishes and Statements. In an action for damages, brought by minor children, in the name of their mother as their guardian, for the wrongful shooting of their father, testimony of the mother as to whether she wanted a preliminary hearing of defendants is incompetent. Her wish or opinion on the subject is not binding on the plaintiffs, nor does the result of a preliminary hearing conclude either plaintiffs or defendants, nor does what the mother said at the time of the hearing about not blaming defendants. To admit such testimony on behalf of defendants is error.

14. ———: ———: Statements of Deceased. In an action for damages for the wrongful shooting of another, statements by deceased while being taken home, and after reaching home, that he did not blame defendants and did not know why he did not speak before defendants, supposing him to be a negro thief, shot him, not being offered as a dying declaration and not being of the *res gestae*, is inadmissible.

Appeal from Pemiscot Circuit Court.—*Hon Sterling H. McCarty,* Judge.

REVERSED AND REMANDED.

*Ward & Reeves* for appellants.

(1) The defendants, both having testified that they each shot deceased, and from which wounds he died, and that at the time they shot him he was not saying a word, or making any effort to attack them, and did not have a gun or weapon and made no threat nor hostile demonstration against them, but they shot him because he did not raise his hands when one of them demanded it, makes out a clear case of admission of liability for wrongfully killing a human being. Sec. 4218, R. S. 1919; McLaughlin v. Marlatt, 228 S. W. (Mo. App.) 875; Morgan v. Mulhall, 214 Mo. 459; Conway v. Reed, 66 Mo. 346; Morgan v. Cox, 22 Mo. 373; Cole v. Long, 207 Mo. App. 528; State v. Roberts, 242 S. W. 669. (2) The court erred in the

admissibility of testimony.   (a) Defendants were permitted on cross-examination of these plaintiffs' mother to show that she collected the life insurance policy when the husband was killed.  She was not a party to the suit and this money belonged to her individually, and could be no defense or justification or mitigation in the case of the minor children against the defendants for killing their father.   (b) Defendants were permitted to show the general reputation of the negro Tom Collins for being a violent, turbulent and dangerous negro.  This is incompetent.  They could not have proved that the deceased Ollie Gray had a bad reputation for being a bad, dangerous man, without first showing that they acted in self-defense.  State v. Zorn, 202 Mo. 30; State v. Harris, 59 Mo. 553; State v. Woods, 274 Mo. 617.  Collins was, at the time of the killing, being held under guard by a gun, and was in no way connected with the deceased. These minor defendants ought not to be defeated because some negro in the neighborhood had a bad reputation. (c) Defendants were permitted to show what the deceased said about why he did not throw up his hands when commanded.  It could be no defense to this action or any justification for defendants to kill a man because he did not throw up his hands when he was commanded to do it.  They were not officers, they had no warrant, the deceased had committed no crime and they made no statement to him that they arrested him, nor did they attempt to arrest him.  (d) Defendants were permitted to prove what the deceased said in his dying hour to the effect that he did not blame these defendants.  (e) Defendants were permitted to show what the mother of these plaintiffs said about having a preliminary trial. And the court then refused to strike said testimony out after admitting it over defendants' objections.  This was clearly incompetent.  Whether defendants were guilty of a crime and would or would not be bound over in a preliminary could not affect the liability of these defendants in a civil action.  (f) The court erred in permitting the defendants' counsel to ask, and defendants

to answer, the question as to what defendants' appre-
hensions were. Nichols v. Renfrey, 79 Mo. 544; White v.
Moxey, 64 Mo. 560. (3) The court erred in refusing per-
emptory instruction on self-defense. Nichols v. Renfrey,
90 Mo. 403. Plaintiffs make a prima-facie case when
they show deceased was shot by the defendants and died
from the effects thereof, and the burden of proof is then
upon the defendants to show a justification or lawful ex-
cuse for the same. Morgan v. Mulhall, 214 Mo. 460; Mc-
Laughlin v. Marlatt, 296 Mo. 656; Conway v. Reed, 66
Mo. 346. (4) The court erred in giving defendants' In-
structions, 7, 8, 9 and 10. (a) Instruction 7 tells the jury
that defendants, as private citizens had a right to arrest
a negro committing a misdemeanor without a warrant,
and that although the deceased was not with the negro
and was not stealing corn, but when approached by de-
fendants and ordered to raise his hands he did not do
that, but advanced towards defendants, then they had a
right to shoot him. Said instruction also had incorpo-
rated in it that defendants commanded the deceased to
consider himself under arrest. There was absolutely no
testimony that anything was said about an arrest. A
private citizen cannot arrest for a misdemeanor not
committed in his presence, especially a misdemeanor as
stealing.   3 Cyc. 787-880; State v. Davis, 44 Mo. App.
513; State ex rel. Brennan v. Dierker, 101 Mo. App. 636;
State v. McAnally, 87 Mo. 644; 3 Cyc. 884; 5 C. J. 401;
Wehmeyer v. Mulvihill, 150 Mo. App. 206. (b) Instruc-
tion 8 tells the jury that defendants did not have to
"stand with their arms folded until it was too late to
strike, but if they had reasonable cause to apprehend
immediate danger they had a right to act on appearances
and kill Gray," etc. There is absolutely no testimony
whatever to base that instruction on. (c) Instruction 9
is a long instruction following the facts in the case as to
agreement to search for the thief, the meeting place of
Gray, the defendants and Hanna, and telling the jury
that if they found the negro thief these private citizens
had a right to arrest them, and if deceased Gray, "failed

and refused to make known his identity, and by his conduct led defendants to believe he was the thief, then they had a right to shoot him.'' This instruction is such a clear defiance of the facts and law of this case that nothing further need be said about it. (d) Instruction 10 tells the jury that if the negro thief had a bad reputation for being a violent and dangerous man, then the jury should take this fact into consideration in determining the reasonableness of the appearance of Gray.

*McKay & Medling, H. E. Doerner* and *C. E. Bragg* for respondents.

(1) The verdict and judgment is fully supported by both the law and the evidence. Respondents having testified as to the movements and conduct of Gray at the time they fired the shot that killed him, and of having his hands apparently in his pockets, his conduct in refusing to throw up his hands, certainly gave them reasonable cause to apprehend immediate danger, and the right to act upon those appearances. This testimony is also corroborated by the witnesses for appellants, all of which shows that Gray was advancing in a side-wise movement toward respondents in a threatening attitude. The rule applies in criminal cases as to the rights to take life may be invoked with equal force in a civil action for damages resulting from death. A homicide is justifiable when committed on a person in defense of himself. 13 Cyc. 327; McClure v. Englehart, 33 S. W. 80; Vawter v. Hultz, 112 Mo. 633; White v. Maxey, 64 Mo. 552; Becker v. Sale, 8 Mo. App. 211; Croft v. Smith, 51 S. W. 1089. (2) The court did not err in the admissibility of testimony. (a) The witness having been asked and permitted to answer for plaintiff that deceased was a man of no means, on cross-examination it was surely competent to show just what property he did have, including any insurance he may have left the children or his estate. (b) The respondents pleaded contributory negligence in their answer, and sought to show by the statements of Gray at

the time he was shot and immediately after he was shot, that his injury was due to his own negligence in failing to make himself known and in failing to speak or put up his hands. (c) Defendants are rightfully permitted to prove the general bad reputation of the negro for being a violent or dangerous man. Respondents having offered evidence that they acted in self-defense it was competent to be taken into consideration by the jury in determining the reasonableness of their apprehensions at the time they shot Gray. (d) The statements of Gray made immediately after the shooting was part of the *res gestae* and was competent as corroborating respondents' testimony. (e) There was no error in permitting respondents to testify as why they shot Gray, for this testimony was competent to show motive on their part. State v. Banks, 73 Mo. 592; Vansickle v. Brown, 68 Mo. 634. (3) The testimony shows an overt act on the part of Gray, and the peremptory instruction as to self-defense was properly refused. (4) Respondents' Instructions 7, 8, 9 and 10 are correct and the court committed no error in giving them or either of them. There was but one issue to be determined by the jury and that was the question of self-defense and these instructions very properly declared the law of self-defense.

LINDSAY, C.—On the 25th day of September, 1919, one Ollie Gray died as the result of gunshot wounds inflicted upon him on that day by respondents. On June 16th, 1920, the appellants, minor children of deceased, brought this suit for damages in the sum of ten thousand dollars, in the Circuit Court of Pemiscot County, by their guardian, the mother of appellants, and widow of Ollie Gray, who had not in her own behalf brought suit on account of the death of her husband. There was a verdict for defendants, by ten jurors, and from the judgment thereon plaintiffs have appealed by due steps taken.

The petition charged that the defendants "wrongfully" fired and discharged a loaded gun at and against Ollie Gray, "thereby wrongfully and without any just

cause or excuse injuring and wounding the said Ollie Gray, from which injuries and wounds and unlawful acts of the defendants'' he immediately thereafter died. The petition did not charge negligence, nor did it set forth the particular circumstances under which the shooting was done by defendants. The separate answers filed by the defendants were identical in character. Each consisting of (1) a general denial, (2) a plea of self-defense and (3) a plea that the shooting and killing was caused by the negligence and carelessness of Ollie Gray directly contributing thereto. There was no specification of facts constituting either of these defenses. Plaintiff's reply was a general denial. Defendants objected to the introduction of any evidence, upon the grounds that the petition failed to state a cause of action against defendants, or either of them, and that there was a misjoinder of parties defendant. The objection was overruled, and defendants excepted.

The shooting occurred at night, and near the cabin of one Tom Collins, a negro. The persons present were defendants Ed Stout and Alvin Earls, a man named Hannah, Ollie Gray and Tom Collins. All of them had crops in one enclosed field of about one hundred and sixty acres adjacent to the cabin of Tom Collins, and all lived nearby. This negro had been stealing corn from the fields of the others, and they had been watching to catch him stealing. All four of them had been watching the negro on the afternoon and night of the day before the day on which the shooting occurred. On the night before, they had heard him pulling corn in Gray's field, and heard later the sounds as of a sack being thrown down and the feeding of hogs. Defendant Earls testified that on that occasion they heard near the hog pen the sound of talking, and Ollie Gray said it was ''Knox and Tom,'' Knox being also a negro and living near to the other.

They agreed to watch again the following night. On the next afternoon Hannah and Earls watched the negro Tom Collins, and noticed he was wearing a white shirt. The arrangement was that the four of them should meet

again that night, at the place they had met the night before.  The defendants and Hannah, all armed with shot guns, went that night to the place agreed upon, which appears to have been in the field of defendant Stout. For some reason not appearing Ollie Gray did not join them there.  He went alone.  On that afternoon Earls says he told Gray they were going armed and to bring his gun, and that Gray replied it was out of commission. Earls suggested he get one, but Gray did not promise to do so.  He went unarmed, and apparently into his own field of corn to watch for the negro.  The three others watched for the negro Tom Collins from a point not far from his cabin and not far from the field of Ollie Gray. Toward eleven o'clock the negro, Collins, came out singing.  They heard him say, "I feel like a sixteen-year-old tonight."  He went toward the corn field of Ollie Gray, and they heard a sound as of some one pulling corn. They moved up to a path by which they expected the negro to return, but, as he did not return that way, and hearing sounds from the negro's hog pen, near his house, as of corn being thrown down, and as if hogs were being fed, they moved up that way.  Earls and Hannah told defendant Stout, who was hard of hearing, of the sounds, and placed him between themselves so he might hear what was said by the others.  They went forward.  They came to where there were some boxes or coops piled up, and there were some trees about.  It was very dark.  As they passed the boxes they saw the forms of two men. The negro Tom Collins was nearest to Hannah, who advanced quickly and threw his gun down on the negro, telling him to hold up his hands.  This the negro did, saying, "They are up, Mr. Hannah."  This was heard by Earls, who was on the right, and nearer than Hannah was to the man who proved to be Ollie Gray, who was to the right of and several feet distant from the negro. Earls was nearest Gray, who was standing, or slowly walking up at that time.  The two defendants moving up, presented their guns at the other man (Gray), and Earls called three or four times, "Throw up your hands" or

"Stick up your hands, Tom." This was heard by Stout, and also by Hannah, whose attention was directed chiefly to the negro. Gray had his hands down by his side, but it was too dark to tell whether they were in his pockets, or not. He was dressed in blue or dark clothes.

The defendant Stout described what happened from the time they saw the two men, as follows:

"I could not distinguish who anybody was, or the man I saw over there, because it was dark and I could not tell only the bulk of the man. I didn't say anything to him. I heard Alvin (Earls) say, 'Hold up your hands,' four or five times, 'Tom.' Then this man put his hands in his pockets and came toward us. When he moved he had both hands in his pockets. I never heard him say anything. When the shots were fired I guess he was somewhere within nine or ten feet of me. I shot because I thought he was the negro and if he got to the house I considered he would get me, any of us if he could." Cross Examination:

"It was a dark night; I could't tell then whether it was a white man or a nigger. He was kinda stepping towards us. He was fronting us, kinda walking down towards us in the direction of the negro house, and I was afraid he would get to the negro house and shoot me. I don't hardly know how far he would have had to go from where I saw him over to the nigger's house, might have been fifteen feet, maybe twenty, somewhere between ten and twenty feet, I didn't measure it. The best I could tell he was walking kind of sideways toward the house, but still facing us boys. He did not have a gun in his hand, he had his hands in his pocket; the best I could tell they were in his pockets. I shot because I thought if he got to the house he would kill us all. I can't say if he had a gun on him. . . . I saw the man that was coming towards me, and I didn't hear him say anything. Yes, sir, I heard Earls tell him to stick up his hands four times, and when he didn't stick up his hands Earls shot, and then I shot."

The defendant Earls described it as follows:

Gray v. Earls.

"We waited there for some little while and we heard the nigger come up singing around, said he felt like a sixteen-year-old, and then he went on out and we heard him breaking corn out in the field, which was Ollie's field. We then crossed over in front of the lot—crossed the corner of the nigger's yard, there was a path leading by there that we thought the nigger would have to come by us to get there and he didn't come by. After waiting there awhile we heard him throw his corn in the hog pen in the yard. Mr. Hannah took to the left and we taken to the right—I seen two men there the best I can recall, and the one that proved later to be Ollie was standing out like down that way from me, as I came around the boxes around that way. I called him Tom and told him to stick up his hands. I says—at that time he began to kind of sidle down this way (indicating)—and I continued to call on him four or five times to put up his hands, and he didn't do it.

"Q. Did he do anything?" A. He didn't. He made no answer, but when he was directly out in front of me I felt like I had chances to risk no longer, and I fired. When I fired, Ed fired. After we shot he said, 'You shot the wrong man.'"

Cross Examination: "I fired one shot at Ollie. I was about twelve feet from him and it was awful dark. I couldn't positively tell his hands were in his pockets, but his hands were down—they were down here (indicating) I walked up within twelve feet of these fellows and when I got there I said, 'Throw up your hands' and he didn't do it, and I called on him four or five times; I felt like I waited as long as I could possibly wait. I judge he made six or seven steps toward us; he had gotten right about even with us, when he got up even he was kind of backing down the side of the fence. He was where he could have seen us all; I can't say he was looking at us; he was backing this way (indicating), and when he got up close to me I fired. I couldn't say that he came on us like he was going to do anything. I thought he would; I thought he was backing up to shoot.

No, sir, he did not have a gun. He did not come on to me. He made no threats. He never said a word about hurting me; actions that he did caused me to shoot, and the actions that he was in, sidling down that way and refusing to do what I told him. No, sir, I never asked him his name.''

Defendant Earls, in the course of his cross-examination, also testified:

''I heard Mr. Hannah say 'Stick up your hands,' and I heard the nigger say, 'They are up, Mr. Hannah.' Yes, sir, I knew Tom Collins and I knew it was the nigger, naturally popped in my mind—knowed this other one was a nigger the same thing. The nigger with the white shirt on was about four feet from the other fellow to my judgment—being dark. If I had been paying attention to that, I could have told that one of these men had on a white shirt.''

Hannah testified: ''Before Earls and I went out there I told Mr. Earls at the time—just when we were going around there—I said, 'Let's don't shoot these niggers, we haven't got any right to shoot them,' and Earls said, 'No, we will make that nigger drag that corn to Ollie Gray's.' ''

Hannah testified that before they went up toward where the negro was, they had heard the sound of two parties talking, and did not know who they were, but supposed they were negroes. Tom Collins escaped in the confusion, caused by the shooting of Gray, and appears no more in the case. But, Earls shot at him as he was escaping, and after he knew he (Earls) had shot Gray.

Over the objection of plaintiffs, the court permitted the defendants to prove by plaintiffs' mother, on cross-examination, that she collected the double indemnity on a policy of life insurance for one thousand dollars, having a clause of double indemnity in case of death by accident, she being the sole beneficiary under the policy. Over plaintiffs' objections the court permitted defendants to show the general reputation of Tom Collins for being a turbulent and dangerous negro; to show what

Ollie Gray said after he was taken home as to why he did not throw up his hands when it was demanded; to show what he said in the hour or so during which he lived after being taken home, to the effect that he did not blame defendants; to show what the mother of plaintiffs said as to a preliminary hearing of defendants before a justice being necessary or desired by her; and permitted each of the defendants to testify as to what his apprehensions were at the time he shot; of all of which plaintiffs here complain.

At the close of the case plaintiffs asked for an instruction, numbered "A," that under the pleadings and the evidence, the finding could not be for defendants on the plea of self-defense. This the court refused to give, and the refusal is assigned here as error. Failing in this, plaintiffs then asked and the court gave six other instructions for plaintiffs.

Plaintiffs' instruction numbered 1 told the jury that if the defendants shot and killed Ollie Gray the verdict should be for plaintiffs, provided the defendants did not act therein in self-defense as defined in other instructions.

Instruction numbered 2 was upon the measure of damages.

Instruction numbered 3, told the jury that defendants in shooting and killing Gray were not justifiable on any theory, except that of self-defense, and that it was no defense that defendants mistook Ollie Gray for another person, believed he was another, and did not know they were shooting him.

Instruction numbered 4 told the jury that although Ollie Gray approached defendants in the nighttime when he knew they were armed and searching for the negro, and did not make known his identity to them, and they did not know who he was, these facts did not justify their shooting him, unless by some movement or act of his they had cause to believe and did believe he was about to take their lives or do them great bodily harm,

298 Mo.—9

and defendants acted thereon to defend themselves from such apprehended danger.

Instruction 5 told the jury that if defendants had no reasonable cause to apprehend that deceased intended to take their lives or do them great bodily harm, but fired in a reckless and careless manner, there was then no self-defense in the case, and the jury could not find for defendants on that ground.

Instruction 6 told the jury that if defendants shot Ollie Gray in a vital part, the law presumes they intended the natural and probable consequences of their act, and intended to take his life.

On behalf of the defendants the court gave instructions numbered 7, 8, 9, and 10 as follows:

"7. The court instructs the jury that under the law any private citizen has the right to arrest any person whom they see in the act of violating the law. You are therefore instructed that if defendants had been informed that some negroes had been stealing their corn from their fields or, the corn of their neighbors, and that said defendants heard said negroes in the field pulling corn and followed them to their premises where they heard them throw down a sack of corn, defendants had the right to arrest said negroes and in making such arrest had the right to use such reasonable force as was necessary to apprehend said negroes. And if you further find that defendants commanded the persons to raise their hands and consider themselves under arrest and that one of said persons refused to raise his hands but advanced toward defendants, then you are instructed, if the conduct of such person was such as to cause defendants to apprehend a design on his part to do defendants some great personal injury or to kill defendants, or either of them, then defendants had the right to defend themselves against such threatened danger as is defined by the instruction herein.

"8. The court instructs the jury that when danger is threatened and impending a person is not compelled to stand with arms folded until it is too late to strike,

but the law permits him to act on reasonable fear, and in this case, if the defendants had reasonable cause to apprehend that Ollie Gray, whom they thought to be a negro thief, if you find the defendants did think said Gray to be a negro thief, had a design to do them, or either of them, some great personal injury, and that there was reasonable cause to apprehend immediate danger of such design being accomplished, then defendants had the right to act on appearances and kill Gray to prevent such design being accomplished, and such killing would be justifiable, altho it should afterward turn out that the appearances of danger were false and unfounded, and your finding should be for the defendants.

"9.   The jury are instructed that if you find and believe from the evidence in this case, that defendants and deceased, Ollie Gray, agreed to go in search of a thief, whom they were informed had been stealing their corn from the fields of defendants and others; that pursuant to such agreement, defendants and one Hannah met, at the time and place agreed upon; that deceased, Ollie Gray, failed to meet at the place and at the time agreed upon, that defendants and said Hannah went in search of said thief in accordance with said agreement and came upon said thief in the act of feeding to his hogs corn stolen by him; then you are instructed that defendants and said Hannah had the lawful right to arrest said thief.   And if you further find that deceased, Ollie Gray, failed and refused to make known his identity to the defendants, and by his conduct led defendants to believe that he was the thief, and that the defendants or either of them fired the fatal shot that killed Gray, under the honest belief that said Gray was one of the thieves who had been stealing the corn, then you cannot find against either of said defendants, and you will find the issues in this case for the defendants, providing you further find that defendants were justifiable in shooting Gray as defined under the instruction given in this case defining the right of self-defense.

"10.   In determining the reasonableness of the ap-

pearances to defendants at the time of the shooting of Gray, the jury should take into consideration the reputation of the negro thief, providing you find defendants to believe at the time that Gray was said negro thief, for being a violent, dangerous man.''

Plaintiffs complain of each of defendant's instructions. The petition here, in charging a wrongful shooting and in charging that the death of Ollie Gray was

Pleading.

caused by the wrongful and unlawful acts of the defendants, and in failing to charge negligence, can be construed only as a charge of an unlawful shooting, as distinguished from a merely negligent shooting. Therefore, the pleadings here present in part an issue made by the petition and answer in the case of McLaughlin v. Marlatt, 296 Mo. 656, recently decided in this Division, and in view of what was there held, and of the disposition to be made in this case, some reference to that case seems necessary. In the McLaughlin Case the petition charged an intentional and unlawful shooting. The answer pleaded that the shooting was without malice and unintentional, and also pleaded contributory negligence. In that case the defendant, on his own farm, shot into the grass, thinking there was a fox in the grass. His act was one ordinarily harmless and not forbidden, except that by his haste and failure to look he did not see the plaintiff before shooting. It was held that the pleader should have charged negligence in ''a plain and concise statement of the facts constituting the cause of action,'' and not an intentional shooting of the plaintiff. The decision in Conway v. Elder, 66 Mo. 346, in holding that a charge of unlawful shooting could be sustained by proof of the shooting of plaintiff by defendant and cast upon the latter the burden of showing it was done without fault on his part, or, if careless, he must show the mitigating circumstances, was overruled.

There is a material difference between the case at bar and the Conway and McLaughlin cases. It consists in the fact that these defendants as private persons were intentionally shooting at a man, whom they were assum-

ing the right to take for an offense below felony, but, of
whose identity and connection with the offense
they were at the time uncertain, and were in
fact mistaken; and the offense was one com-
pleted, and had not been committed in their presence.
The various theories, of the plaintiffs, of the defendants
and of the court are sufficiently indicated by what has
been outlined above.   There was negligence recognized
in instruction numbered 5 for plaintiffs that defendants
might have "fired" the shots "in a reckless and careless
manner." The case involves something more grave than
mere negligence, or carelessness.

<span style="margin">Authority to Arrest.</span>

    The larceny which the negro, Tom Collins, had com-
mitted, was petit larceny. [Sec. 3324, R. S. 1919.]   It
was complete, and the corn thrown to the hogs before the
defendants went directly in search of him.   The same
facts and reason would govern if the offense be con-
sidered as one to which the provisions of Sections 3385
and 3387, Revised Statutes 1919, would apply.   Under
Section 3387 the owner or person in possession of prem-
ises may without warrant arrest "any person found in
the actual perpetration of any offense mentioned in
Section 3385," that is, wilfully and maliciously, or wan-
tonly and without right entering the premises of another
and taking and carrying away any "grain," etc., being
and growing thereon.   In either case the offense was not
committed in the presence of defendants, nor did they
find the negro in the actual perpetration of it.   This is
so, because this negro, Tom Collins, was the only negro
or person, as appears from the record, whom they had
suspected or watched and followed as the one stealing
the corn, yet, when they undertook to apprehend this
negro, and found two men, they were not able, because of
the darkness, distances and other circumstances, to
identify this negro before assuming to take two men.   In
Brown v. Wallis, 101 S. W. 1070, the Texas Court of
Civil Appeals quoted from Hughes v. Commonwealth, 41
S. W. (Ky.) 296:
    " 'In the presence of' in the statute, means in the

sight of, or that the act be done in such manner that the officer can detect it by sight or hearing as the act of the accused.    That is to say, it is not sufficient that he officer is within seeing or hearing distance of the criminal act and thereby obtains knowledge of the fact, but he must also be able to 'detect it by sight or hearing as the act of the accused.' "

See also People v. Bartz, 53 Mich. 493.

These were cases wherein the arrest was made or attempted by a police officer as for a breach of the peace.

No statute has been pointed out or found authorizing private persons to make arrests in the circumstances here shown.    Police officers in cities have certain powers under statutes applicable to cities of the various classes, but, "peace officers, in the absence of an empowering statute, have no authority to arrest an individual for a misdemeanor without process, except on view; that is, when they witness the perpetration of the offense." [State ex rel. v. Dierker, 101 Mo. App. 643, citing State v. Hancock, 73 Mo. App. 19; State v. Underwood, 75 Mo. 230; State v. Grant, 76 Mo. 236; State v. Holcomb, 86 Mo. 371.]    Also, in the situation presented, the manner in which defendants proceeded in undertaking to arrest or to catch the person thought by them to be one of two men, is necessary to be considered, since defendants invoke the doctrine of arrest in justification of their acts. [State v. Rollins, 226 Mo. 536; Secs. 3913 and 3914, R. S. 1919.]    They gave no notice of their own identity or purpose other than in the demand, "Hold up your hands," made suddenly in the darkness.

An officer must make reasonable disclosure, adapted to the circumstances, of his character and purpose, and make it to the person against whom he is expecting to act.    [State v. Rollins, supra; State v. Underwood, 75 Mo. 238; State v. Grant, 76 Mo. 1. c. 247; State v. Spaugh, 200 Mo. 1. c. 601.]    The defendants owed at least an equal duty to the person against whom they were moving.    Their own evidence tends much to show a wanton disregard of that duty.

A quicker wit, or an involuntary exclamation of the deceased, might have saved him; nevertheless, it cannot be said that shooting him in a proceeding to arrest for the cause, and in the manner here shown, was negligence only, and not unlawful and intentional. The defendants did not have the lawful right to make and enforce the demand, in the case and under the circumstances presented; and beyond that, their testimony and other testimony tends strongly to show that they shot because they thought the deceased was a negro, and he did not throw up his hands, although there was no appearance of immediate resistance, or danger to themselves. If so, the shooting was wanton, and showed such reckless indifference to. the rights of others as constituted an unlawful invasion thereof.

The petition does not use the word "intentionally," but, taking the language actually used, it must be construed as charging that the "wrongful act" was intentionally done. This necessarily includes malice in the

**Intentionally.** sense in which the term is used in the law. It need not be any personal ill will toward the party injured. It may be of a general nature, let the injury fall where it may. It may be wantonness or reckless disregard of the rights of others. [McNamara v. Transit Co., 182 Mo. 681; Trauerman v. Lippincott, 39 Mo. App. 486; Goetz v. Ambs, 27 Mo. 28.] The allegations of the petition and the evidence considered together distinguish it from the case of McLaughlin v. Marlatt. See also White v. Maxey, 64 Mo. 552.

Plaintiffs contend it was error to refuse the peremptory instruction asked on self-defense, and that there is no self-defense in the case. Under the facts in the record defendants' right of self-defense could have been only a qualified or imperfect right at most. It is not lawful

**Self-Defense.** in undertaking to arrest for a misdemeanor to shoot the part because he attempts to escape, and a person may make reasonable resistance to an attempt to arrest him illegally. Granted that the defendants had no felonious purpose, they yet brought

about an unwarranted and perilous situation, and though they may have believed they were in imminent peril from the deceased, and shot him in that belief, they are not wholly justified on that account. If they shot wantonly and recklessly, there was no self-defense. [Nichols v. Winfrey, 90 Mo. 403.]  The instruction should have been given.

As to the instructions for defendants:  The first sentence of Instruction 7 is too broad in any case.  All the testimony is to the effect that defendants only saw, heard and spoke of one negro, Tom Collins, as stealing corn, but the instruction uses the plural number throughout.  It, in effect, tells the jury that though the other person was not engaged in stealing corn, yet the defendants as private persons had a right to arrest both of them and for a misdemeanor.  It had embodied in it that defendants commanded deceased to consider himself under arrest.  The defendants used no such language.  There was not a word of testimony that they or Hannah said anything about an arrest.  The instruction was misleading and erroneous.

Misleading Instruction.

Instruction 8 tells the jury that defendants were not compelled to "stand with arms folded until it was too late to strike."  The instruction follows the language of the instruction in Nichols v. Winfrey, 90 Mo. l. c. 407, where the deceased was continuously the aggressor, and the defendant, in his own store, shot while deceased was advancing after having already struck defendant.  It was not adapted to the circumstances here shown, and was unfair and prejudicial to defendants.  It tells the jury that if defendants had reasonable cause to apprehend immediate danger from Ollie Gray, whom they thought to be a negro thief, they had a right to act on appearances and kill Gray, and the killing would be justifiable without further qualification.  This literally substitutes Ollie Gray for a negro thief.  It is confusing and not based on any evidence or the actual situation disclosed.

Apprehended Danger.

Instruction 9 recites the agreement of defendants

and Ollie Gray to meet and go in search of a thief, and contains the premise that if defendants and one Hannah came upon said thief in the act of feeding to his hogs corn stolen by him, then the defendants and Hannah had the right to arrest said thief. This contained an assumption not in evidence. There is no testimony that they came upon the thief in the .act mentioned. The act was complete and the negro had returned to his yard. The instruction contains the further assumption that if Gray failed and refused to make known his identity, and led defendants to believe he was "the thief," and defendants fired in the honest belief that he was "one of the thieves," they could not find against defendants, provided defendants were justifiable in shooting him under the instruction defining the right of self-defense. The instruction as a whole was confusing and misleading, and contained assumptions of fact not shown in evidence, and unwarranted assumptions of law, undertaking to wholly justify defendants.

*Assumption of Facts and Law.*

Instruction 10 told the jury that in judging of the appearance of Gray, the defendants could take into consideration the reputation of the negro, Tom Collins. The testimony of defendant Earls shows that before he shot, he heard Hannah tell the negro to hold up his hands and heard the reply, "They are up. Mr. Hannah," and he says he knew the negro. He shot anyhow at the other man, and defendant Stout, nearer than he to Hannah and Tom Collins, shot immediately after. Under the testimony of defendants themselves, it is not seen how the bad reputation of the negro could be thus applied to the other man, Ollie Gray, who defendants say had no arms, and made no threats. They do not claim they believe the man they thought was a negro, and whom they shot, had any arms about him, but, that they feared he would go into the cabin twenty feet away and afterwards shoot them. With no showing that they acted in self-defense, this instruction should not have been given. [State v. Harris, 59 Mo. l. c. 553; State v.

*Reputation.*

Zorn, 202 Mo. l. c. 30; State v. Coleman, 186 Mo. l. c. 157.] For the same reason the testimony as to the bad reputation of Tom Collins should have been excluded.

Allowing plaintiffs' mother to testify that she collected the insurance policy, with its double indemnity clause in case of death by accident, payable to her alone,

**Life Insurance.** was error. It formed no part of the estate of the deceased. Nor was it proper to allow defendants to answer questions calling for conclusions as to why they fired, or what they thought the man they saw was going to do, or what their apprehensions were. This was error in this suit for damages. [Nichols, v. Winfrey, 79 Mo. 554; White v. Maxcy, 64 Mo. 552.]

It was error to permit or require the mother of plaintiffs to testify as to whether she wanted a preliminary hearing of defendants, or not. Her wish or

**Mother's Wishes and Opinion.** opinion on that subject at a former time was in no wise binding upon the plaintiffs. The result of a preliminary hearing of defendants before a justice could not conclude either plaintiffs or defendants in this action. [State v. Coleman, 186 Mo. 159.] For like reasons it was error to permit a witness to testify as to what plaintiff's mother said about the time of the preliminary, as to not blaming the defendants.

The statements of Ollie Gray while being taken home and after reaching home, that he did not blame defend-

**Statements of Deceased.** ants, or did not know why he did not speak before being shot, were not offered as dying declaration, and were not of the *res gestae,* and this testimony should not have been admitted.

For the errors referred to, and upon the whole record, the judgment should be reversed, and the cause remanded. It is so ordered. *Small, C.,* concurs; *Brown,* C., not sitting.

PER CURIAM:—The foregoing opinion of Lindsay, C., is hereby adopted as the opinion of the court. All of the judges concur.