MAE BURNS, RESPONDENT, v. EMORY COLLEY, APPELLANT.*

Springfield Court of Appeals. July 20, 1928.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, section 2995, p. 1012, n. 16; Death, 17CJ, section 182, p. 1313, n. 66, 67; section 235, p. 1350, n. 7; Evidence 22CJ, section 561, p. 470, n. 19; Trial, 38Cyc, p. 1634, n. 15; p. 1653, n. 8.

*Robert Stemmons* and *William B. Skinner* for appellant.

*J. D. Harris* for respondent.

BRADLEY, J.—Plaintiff sued to recover for the alleged wrongful killing of her husband. Petition was filed in Lawrence county, but the venue was changed to Polk county where a trial to a jury resulted in a verdict and judgment for plaintiff in the sum of $3500. Motion for a new trial was overruled and defendant appealed.

Plaintiff alleged that on January 2, 1926, defendant unlawfully, wrongfully, maliciously and intentionally shot and killed her husband, Frank Burns. The answer is a general denial.

Error is assigned (1) on the refusal of an instruction in the nature of a demurrer to the evidence at the close of the case; (2) on instruction given, modified and refused; (3) on the admission and exclusion of evidence; and (4) on an alleged excessive verdict.

At the time of the killing defendant resided with his family on a farm about ten miles west of Mount Vernon in Lawrence county and deceased resided with his family in Mount Vernon. Burns was shot and killed by defendant on defendant's farm near midnight on January 2, 1926. Deceased, during the summer, did odd jobs about town and other work, but during the winter spent most of his time hunting and trapping. On the night of January 2nd deceased and William Conway, a young man twenty-four years old who had been making his home for some time with the family of deceased, drove in an automobile from Mount Vernon to the neighborhood of defendant's farm to hunt for coon. Deceased and Conway took with them three dogs, a 22 target rifle, a lantern and a "skinning knife" which deceased carried in a scabbard in a pocket on the right leg of his overalls. They stopped at a bridge not far distant from defendant's home, left the automobile and proceeded on foot. Deceased was crippled in one leg and cut a stick which he carried to aid him in walking. Deceased and Conway after leaving the automobile first went upon the land of Clay Connell. It was a rainy, misty night, but the moon gave some light. About eleven o'clock Connell noticed the light of the lantern down in the valley on his premises and went down to see about it. Connell knew deceased and told him and Conway that he did not allow hunting on his land. On being informed by Connell that hunting was not permitted on his land deceased remarked that he would go down on defendant's land; that he had permission from defendant to hunt on his land. Deceased and Conway proceeded and went upon defendant's land. Connell doubted that defendant had given the permission which deceased claimed and when he, Connell, returned to his house he telephoned defendant that deceased and another had gone upon his land to hunt. On receipt of the message from Connell defendant and his son, a young man, went out to investigate, and Loyd Colley, defendant's son, carried with him an automatic shot gun. Shortly after leaving the house defendant and his son separated and the son was the first to discover deceased and Conway. According to Conway, who was a witness for plaintiff, Loyd Colley, the son, when he discovered deceased and witness ran up to them and ordered them to "stick 'em up." Conway and defendant and the son were witnesses. Plaintiff bases her case largely upon the evidence of Conway.

As to what occurred from the time Loyd Colley came upon Conway and deceased, Conway testified: That the boy came running up and ordered them to "stick 'em up" and said: "I want to know where in the hell you boys are going;" that they told him they were trying to have a little coon chase; that Loyd Colley had an automatic shot gun; that deceased said, "Let's not be in no big hurry about it" (Sticking 'em up); that the son came up pretty close to deceased and that they were kind of quarreling; that the son told them that hunting was not allowed on his father's land and that they said, "All right we would get out;" that witness and deceased turned around and started back up the creek to get off the place, "that is to come back the way we came;" that young Coley told them to go north, the nearest way off and that they said "no, that our car was up the creek and we would go up that way;" that young Colley followed behind them and had the gun kind of pointed towards them and that deceased told young Colley to either get in front or off to the side and not to walk with the gun pointed as it was; that the boy said he would not do that and that deceased said if he did not that he, deceased, would "knock his head off" and that thereupon the boy stopped.

Conway further testified that after young Colley stopped that he, witness, and deceased went on up the creek and met defendant; that defendant ran up and said: "I want to know why you blew the lantern out;" that they had blown the lantern out when the "dogs were running a coon down there;" that they could see to walk without the lantern, but that deceased would not tell defendant why the lantern was blown out; that deceased kept trying to tell defendant about the coon race, but that defendant would not listen; that defendant was "awful mad;" that deceased pointed with the walking stick trying to show defendant the way the dogs were going; that defendant jerked the walking stick from deceased and threw it away; "that the stick was about the size of your little finger at the little end and tapered to the size of your thumb;" that defendant called his son and said: "Bring me the gun, I'll use it;" that the boy brought the gun to him, and that the defendant, "hauled off and struck at" deceased with the gun; that deceased dodged the blow; that defendant again struck and that deceased caught the gun and said: "Don't hit me any more;" that defendant then commenced punching deceased in the stomach with the muzzle of the gun; that deceased retreated and told defendant he would leave; that defendant "punched him a few times there and Mr. Burns was running backward and the gun fired" and Burns was instantly killed. Conway further testified that all the time deceased and defendant were engaged in the altercation deceased held the lantern in his hand; that the witness had the target rifle; that when shot de-

ceased fell on his right side; that defendant "put his hand on him and he turned him over on his back" and said: "I guess by God I have killed him."

Conway further testified that immediately after the shooting defendant sent his son to call the sheriff and defendant and witness remained with the dead body; that after young Colley had gone defendant remarked that deceased had something in his hand when shot; that the lantern was then lighted and that he, witness, looked for the skinning knife and that it was in its scabbard and "still in the pocket."

Loyd Colley, defendant's son, testified concerning the shooting as follows: "I heard my dad holler and ask them why they blew out the lantern. They were up the creek from where I was, in the direction Burns had gone. I just kept on walking up that way. I walked up that way and dad asked them if they met up with me and they didn't seem to answer him, and dad took out a flash light and had it on them, and I walked up that way and when I got there Burns was waving a stick in dad's face. The lantern that Conway had was not lighted at that time. He, deceased, was waving the stick up in his face right across in front of his face and dad grabbed the stick out of his hand and threw it down, so when he did that Burns slapped his hand right back on his hip and we seen the gleam of something bright shining and dad says, 'Give me that gun,' and I handed it to him and I shoved it to him like that (indicating) upside down and he took it overhanded and struck him overhanded using it as a club. Burns dodged it, and dad struck at him again and he caught the gun and they were scuffling over it, and it was accidentally discharged. They were scuffling over the gun. He caught it with one hand and finally got it with the other, and both of them had the gun. . . . The discharge of the gun struck the body of Mr. Burns. Mr. Burns had hold of the barrel and my father had hold of the stock. I remained there after he fell. I stayed there quite a little bit and so dad said, 'I believe he is dead' and William Conway said, 'I don't believe he is,' so dad said, 'Light your lantern,' and this Conway boy lit the lantern. The Conway boy still had the lantern in his hand, and dad says, 'What was that he had in his hand, was it a gun?' and he said he had no gun and dad commenced looking on the ground to see what it was, and this Conway boy walked around to the side of him and pulled his overcoat back and there lay his knife in his hip boot."

Defendant gave the following version of what occurred: "I met them almost where they put the light out. Burns said they didn't need it; the boy didn't talk at all, he didn't talk a word until after. I asked him if he had seen the boy and he said 'yes' and about that time the boy come up right behind them and said, 'Pa, they just give me a cussing,' and I said, 'Burns did you give him a cussing,' and

he said 'Yes, I did' and I said, 'Now listen, you know that Connell told you I didn't allow hunting and you told him I had given you permission and you told what wasn't so' and then is when he took a switch and waved it in front of my face, and you know that when it whistles in front of your face it doesn't sound good. I put the flash light on them to see who they was, I think it was just before the boy come up and he wouldn't tell me, and I took out my flash light and I said, 'I know you, Burns,' and I said, 'Who is this other fellow with you' and he refused to tell me, he said, 'It don't make a damn bit of difference who it is.' I could see the rifle and the lantern. Conway had the lantern. At that time he (Burns) had nothing in his hand but the stick. When I struck the stick out of his hand he just reached back like he was going—it looked to me like his hip pocket, he pushed his coat back and it looked to me like he was going to his hip pocket I thought. Well, he went right back here then (indicating), I didn't do nothing until I saw this bright thing he had. Then I asked the boy for the gun. He was stand-ing just to my left. He was very close there, he just reached the gun to me. I took the gun by the stock and struck at his head after I saw his movement. He ducked his head down and I missed him and I raised the gun a little to strike him again, not a very hard lick. I did not raise the gun very high up the second time, I don't know exactly but I didn't strike like I did the first time, and he grabbed the gun with his left hand. He pulled or jerked it from me and pretty soon then he grabbed hold with the other hand, after a little; he held on with the other hand, trying to pull it from me and he was pulling, and pretty soon he got hold with both hands and he grabbed with the second hand, he grabbed it about the trigger, right in about the middle of the gun and knocked it off and it shot him, that is just the way it was. The gun was discharged just im-mediately, almost instantly after he caught it with his second hand. He sank to the ground there and fell on his right side and rolled on his back as he sank down, and I said, 'I believe he is dead,' and this Conway boy said, 'I don't think so' and I said, 'Light the lantern' and he lit the lantern and I said, 'What was that he had in his hand, has he got a gun?' and he said, 'No, he ain't got a gun' and I said, 'He has something.' I then took the lantern and went to looking around on the ground, but I guess it dropped in his boot. I couldn't find it on the ground, so Conway went around and pulled his overcoat back a little on the right side and right in the top of that boot, the boot can be flapped down, when he fell down, the boot top is large and it was spread out and there lay that knife in plain sight. He laid the coat back; it was raining down and he laid the coat back. The knife was enclosed in a leather case, what the witnesses called a scabbard. I think the leather came just up as far as the blade come. I don't know just how far it did come. There

was a little snap around it and it held it around there. That did not cover the entire handle. I think that came just above the shield, I didn't take it and examine it.''

Plaintiff introduced evidence tending to show that defendant in 1921 or 1922 had said that thereafter he was not going' to order hunters off his land, but that he was going to shoot them off. Defendant offered evidence tending to show that the general reputation of deceased for turbulence and violence was bad, and plaintiff offered evidence to the contrary. Defendant also offered evidence tending to show that the gun with which deceased was killed ''was capable of going off with the safety set.''

Plaintiff proceeded on the theory that defendant intentionally shot and killed her husband and that such was done under such circumstances as to make the issue of intention, a self-defense and accident questions for the jury. It is our opinion that the demurrer to the evidence was properly refused. [Hartman v. Hoernle, 201 S. W. (Mo. App.) 911; Morgan v. Mulhall, 214 Mo. 451, 114 S. W. 4; White v. Maxcy, 64 Mo. 552; Gray v. Earls, 298 Mo. 116, 250 S. W. 567.]

Plaintiff's instructions 1, 3, 4 and 5 are challenged. It is contended that plaintiff's instruction No. 1 is erroneous because it attempts to cover the whole case and fails to include the right of defendant to defend his premises. This is a civil case and not criminal and is predicated on the theory of an intentional shooting, hence plaintiff made a prima-facie case for the jury by offering evidence tending to establish that defendant shot deceased. Therefore, self-defense, defense of premises and accident were matters of defense, and were not required in plaintiff's instruction. [Morgan v. Mulhall, supra.] Also it appears that the issue of self-defense was not ignored in instruction No. 1, but by reference was specifically included. And in plaintiff's instruction No. 2 the question as to defendant's rights to defend his premises from a trespasser was submitted. The question of accident was not specifically submitted in plaintiff's instructions, but in defendant's instruction No. 12 the court told the jury that before plaintiff could recover she must establish by the greater weight of the evidence that defendant intentionally killed deceased, and that unless the jury so found the verdict would be for defendant. As stated plaintiff bottomed her cause on the theory that defendant intentionally shot her husband and not on the theory of negligence and her cause was submitted in her instructions on the theory that the shooting was intentional. Also in defendant's instruction No. 9, which was given after modification by the court, the question of accident was specifically submitted.

Plaintiff's instruction No. 3 is as follows: ''The court instructs the jury that the right of self-defense rests alone upon necessity and does not imply the right of attack, and the plea of justification

in self-defense cannot avail in any case if it appears that the difficulty was sought for or induced by the act of the defendant, in order to afford him a pretense for wreaking his malice. And if you find from the evidence that the defendant, Emory Colley, and the deceased had a difficulty which resulted in the death of the deceased, and that the defendant commenced the difficulty or brought it on by an unlawful act of his, and that he voluntarily, and of his own free will and inclination, entered into the difficulty, then there is no self-defense in the case, and you should not find for defendant on that ground; and in that case it makes no difference how high the passion of the defendant may have arisen or how imminent the peril might have been in which the defendant was placed.''

In State v. Larkin, 250 Mo. 218, l. c. 245, 157 S. W. 600, a similar instruction was condemned. But in considering the instruction the court said: ''The defendant Larkin, with whom, in the views above considered, we are alone concerned, contends that under the facts in this case the giving of instruction numbered six set out in the statement herein, was error. This instruction was based upon the theory that defendant Larkin in some wise 'provoked, or voluntarily sought, brought on or engaged in the quarrel or difficulty with the deceased with the purpose of taking advantage of him and of taking his life or of doing him some great bodily harm.' Can it be said upon the facts in evidence upon this record that there was testimony upon which to bottom this instruction? That in a proper case a proper instruction as to voluntarily provoking or seeking a difficulty, may be given, we have no doubt. This question is so well settled that we need cite no authorities in support thereof. But in order to make proper the giving of such an instruction as this, which, if the facts support it, practically takes away from the defendant the right of self-defense, depends on the facts and circumstances of the case.''

It thus appears that the correctness of giving such an instruction as is plaintiff's instruction No. 3 depends upon the facts of the particular case. In State v. Larkin, it was held that the facts did not justify the instruction condemned.

In White v. Maxcy, 64 Mo. 552, cited supra, and similar in some respects to the cause here, the following instruction was approved:

''The right of self-defense rests alone upon necessity, and does not imply the right of attack, and the plea of justification in self-defense cannot avail in any case, when it appears that the difficulty was sought for or induced by the act of the defendant, in order to afford him a pretense for wreaking his malice. And if you find from the evidence that the defendant, James G. Maxcy, and the deceased had a difficulty, which resulted in the death of the deceased, and that the defendant commenced the difficulty or brought it on by any willful or unlawful act of his or that he voluntarily, and of his own free will and inclination, entered into the difficulty, then there is no self-

defense in the case, and you should not acquit on that ground; and in that case it makes no difference how high the passion of the defendant may have arisen, nor how imminent the peril may have been in which the defendant was placed.''

It will be observed that plaintiff's No. 3 is practically identical with the instruction approved in White v. Maxcy. We have stated the evidence somewhat at length and do not deem it necessary to here specifically consider it as it pertains to instruction No. 3. We think that under the facts and the pertinent law instruction No. 3, was proper.

Defendant complains of plaintiff's instructions 4 and 5 as follows:

''They are argumentative; they single out facts which rest on the testimony of the plaintiff's witness Conway, which are disputed by the testimony of the defendant and his son Loyd Colley, and they give improper prominence and significance to the witness Conway's version of the circumstances of the shooting, and make this witness's testimony the basis upon which the jury would be authorized to find a verdict, and by strong implication these instructions assume the existence of facts which are sharply controverted. They are, in effect, comments on the evidence and erroneous.''

Instructions 4 and 5 are as follows: No. 4. ''The Court instructs the jury that if you find from the evidence that the deceased, Frank Burns, on or about the 2nd day of January, 1926, went on the premises of the defendant to hunt, and that whilst there, the defendant approached the deceased and ordered him off of said premises and that deceased attempted to comply with his command, and that thereupon the defendant seized a loaded shot gun out of the hands of his son and not in the necessary defense of his person, but wrongfully, maliciously and intentionally began to strike the deceased with the same, and that to protect himself, the deceased grabbed hold of the muzzle of said gun (if you so find from the evidence), and that thereupon the defendant began to jab and strike him in the abdomen with the muzzle of said gun, and discharged said gun and the load thereof against the body of the deceased, thereby killing him; then the said killing was wrongful, and the jury must find for the plaintiff, provided, that they find that at the time of said killing that plaintiff was the wife of the deceased.''

No. 5. ''If the jury believe from the evidence that the defendant had no reasonable cause to apprehend that the deceased intended to take defendant's life, or to do him any other great bodily harm, and that, thereupon, the defendant fired the loaded shot gun in revenge or in a reckless, vindictive spirit, then there is no self-defense in the case, and the jury cannot find for the defendant on that ground.''

In White v. Maxcy, 64 Mo. 556, cited supra, an instruction to the same effect as plaintiff's instruction No. 4 was approved. And in

Nichols v. Winfrey, 90 Mo. 403, 2 S. W. 305, an instruction practically indentical with plaintiff's instruction No. 5 was approved.

Defendant requested instruction No. 8 as follows: "The court instructs the jury that the owner of land in the State of Missouri, has the right, in law, to forbid and prevent trespassing on the same, and if an individual enters upon the land of another without his consent and against his will, such owner may request such trespasser to withdraw therefrom, and in case such trespasser refuses to withdraw he may be forcibly removed therefrom, the owner using such force as may be reasonably necessary for that purpose, and in this case, if you find and believe from the evidence that the deceased, Burns, was trespassing upon the lands of the defendant, and the defendant directly or through his son requested the said deceased to leave and withdraw from his premises, and the deceased advanced upon the defendant and made a move to strike defendant with a stick which he had in his hand, and drew a weapon from his clothing, then such movements or either of them constituted an assault upon the defendant, .although such blow was intercepted and failed to reach the defendant, and the weapon so drawn was not used, then in such case the defendant, being upon his own premises, was not obliged to retreat, but had the right, in law, to stand his own ground and then and there repel such assault with whatever force was reasonably necessary to cause the deceased to cease his assault, and in such defense the law required of him only such prudence as is common among ordinarily careful men (and if unusual and unexpected results follow from a defense so made the original wrongdoer and aggressor must suffer for them, and not he, who only engages in the necessary defense of his property and person)."

The court modified the instruction by striking therefrom the concluding portion which we have enclosed in parenthesis. Defendant cites Morgan v. Durfee, 69 Mo. 469, as supporting his contention that it was error to eliminate from the instruction the portion above designated. Morgan v. Durfee was an action by a son for the alleged wrongful killing of his father. Pressley G. Morgan, the deceased, was in the habit of carrying concealed weapons and had a well-established reputation for being a dangerous man and was somewhat superior physically to Durfee. Morgan went into the law office of Durfee and commenced an altercation about a business matter, applied most opprobrious epithets and refused to leave when told to do so, but continued his vile abuse. Durfee said: "Morgan I intend you shall go out," and pushed Morgan backwards a step or two towards a safe which stood by an open door. Morgan seized Durfee by the throat and was choking him. Durfee picked up a notarial seal from the safe and struck Morgan on the head with it. Thereupon Morgan released his grip on Durfee's throat, fell out the door onto the pavement and shortly thereafter died. The court in stating

the facts remarked that Morgan's death was most probably due to the fall on the pavement.

The court in Morgan v. Durfee, reversed a judgment in favor of the plaintiff and in the course of the opinion stated that Durfee was "only responsible for the natural and probable consequences of his act; and not answerable for any unforeseen and unfortunate result which may have attended that act." Such is a correct statement of the law upon the facts there presented. But under the facts of the cause at bar, if the jury found, which they did, that defendant intentionally shot deceased, then there can be no room for the conclusion that the result was unforeseen, unusual or unexpected, as expressed in the eliminated portion of instruction No. 8. We think that under the facts the instruction, minus the eliminated portion, was as favorable to defendant as the law justifies.

Defendant requested instruction No. 9 as follows: "The court instructs the jury that the right of self-defense is a right not only conceded but guaranteed by law to every person. It gives the defendant the right to protect himself from some great personal injury when he has reasonable cause to believe and does believe it is reasonably necessary to repel an assault or a threatened assault from an assailant. In such case it is not necessary that the danger should have been real or about to fall. All that is necessary is that the defendant believed and had reasonable cause to believe in the existence of such danger of great personal injury being inflicted upon him, in determining which he had a right to act on appearances. It is not enough that the defendant believed in the existence of such danger. He must have had reasonable cause for so believing before he is justified in acting in self-defense. On the other hand if you find that he had reasonable cause to believe in the existence of such danger then you must find he is justified in acting in self-defense although you may find that in reality no such danger existed. If justified in acting in self-defenses, as herein defined, at the moment of the altercation with said Burns, and you find that under the circumstances it was reasonably necessary for the defendant to strike said Burns with his gun to ward off danger, then your verdict must be for the defendant although you may believe it was careless and imprudent to use the gun in such a manner, and although it resulted in the death of said Burns."

The court refused instruction No. 9 as requested, but modified and gave it as follows: "The court instructs the jury that the right of self-defense is a right not only conceded but guaranteed by law to every person. It gives the defendant the right to protect himself from some great personal injury when he has had reasonable cause to believe, and does believe it is necessary to repel an assault or threatened assault from an assailant. In such case it is not necessary that the danger should have been real or about to fall. All that is

necessary is that the defendant believed and had reasonable cause to believe in the existence of such danger of great personal injury being inflicted upon him, in determining which he had a right to act on appearances.

"It is not enough that the defendant believed in the existence of such danger. He must have had reasonable cause for so believing before he is justified in acting in self-defense. On the other hand if you find that he had reasonable cause to believe in the existence of such danger then you must find that he is justified in acting in self-defense, although you may find that in reality no such danger existed. If justified in acting in self-defense, as herein defined, he had a right to use such force as is reasonably necessary to repel his assailant, and is not required to nicely gauge the force to be used. If you find that the defendant was justified in acting in self-defense, as herein defined, at the moment of the altercation with said Burns, and find that under the circumstances it was reasonably necessary for the defendant to strike or punch said Burns with his gun to ward off said danger, and that defendant and said Burns became engaged in a struggle over said gun, and that said gun was accidentally discharged during said struggle, and killed said Burns, then your verdict should be for the defendant."

Defendant complains because the court inserted the words "or punch" after the word "strike" near the end of instruction No. 9, and also complains of the concluding language used in the instruction as given, to-wit: "And that the defendant and said Burns became engaged in a difficulty over said gun and that said gun was accidentally discharged during said struggle and killed said Burns, then your verdict should be for the defendant."

It is contended that the insertion of the words "or punch" was erroneous because defendant denied that he used the gun except to strike. But Conway testified that defendant punched deceased in the stomach with the gun. Certainly defendant was not prejudiced by the insertion of the words "or punch." It is argued that by the concluding part of instruction No. 9 defendant's right of self-defense was contingent upon an accident. We cannot agree to such construction. The modified instruction was more favorable to defendant than the original. As modified the instruction gave defendant not only the benefit of the theory of self-defense, but also specifically gave him the benefit of the theory of accident.

Defendant requested and the court refused instruction B. This instruction reads: "The court instructs the jury that in order to entitle the plaintiff to recover damages in this action against the defendant, you must find and believe from the evidence that the deceased, Frank Burns, could have recovered damages against the defendant because of the facts in evidence had he survived the injury to his person by the discharge of the defendant's gun, under the cir-

cumstances in evidence; plaintiff's cause of action, if any, is simply the transmission of a cause of action to her under the statute, which but for the statute would have died with the person injured." Instruction B, was properly refused. [Morgan v. Durfee, 69 Mo. 469, l. c. 480.]

Defendant sought to prove his good character and reputation, but an objection to such evidence was sustained. Defendant's character and reputation were not assailed, hence the ruling of the court was correct. [Vawter v. Heltz, 112 Mo. 633, l. c. 639, 20 S. W. 689; Orris v. Railroad, 279 Mo. 1 l. c. 20, 214 S. W. 124; State ex rel. v. Allen et al., 271 S. W. (Mo. Sup.) 757, l. c. 761.]

Defendant complains because the court excluded evidence (1) that deceased and Conway were in the habit of trespassing on the lands of others; (2) that deceased had the reputation of being a common thief; and (3) as to deceased's reputation for working. Also complaint is made because of the exclusion of an information by which deceased was charged with grand larceny. And also it is contended that defendant was prejudiced because a witness was not permitted to testify as to what deceased said to witness about having syphilis. There is no merit in the assignments based on the admission and exclusion of evidence. Defendant was permitted to introduce evidence that deceased had the general reputation of being turbulent and violent. One witness who had known deceased for a long time testified that about all deceased did was to hunt. And there was similar evidence by other witnesses. Defendant offered evidence without objection that deceased "would trap some on other people." Also it was shown that deceased served a term in the penitentiary for stealing cattle. Defendant succeeded in effect in getting before the jury about everything derogatory of deceased except that he had or had had the syphilis. Plaintiff sought to show that the reason deceased did no more actual work than he did was because he was crippled with rheumatism. Defendant asked his witness Ruckett if he knew what caused deceased's crippled condition. Objection was made that witness was not a physician or an expert and was not competent to testify on the subject. The objection was sustained. Thereupon defendant offered to prove by witness that deceased, at some time not fixed, tried to get money from witness in order to be treated for syphilis. The offer was refused. So far as appears this occurred in the presence of the jury.

Deceased's age, expectancy, health, habits, business capacity, etc., were proper subjects of inquiry on the measure of damages. [Cole v. Long, 207 Mo. App. 528, l. c. 539, 227 S. W. 903.] That deceased was crippled is conceded. If he was crippled from syphilis he may have been of less value to his family than if his lameness was due to rheumatism. There is nothing in the record to enlighten us on this point. But we are not persuaded that we should reverse the judg-

ment merely because of the exclusion of the evidence offered. The record shows that defendant was given a wide range as to evidence, both on the direct examination of his own witnesses and on the cross-examination of plaintiff and her witnesses and we do not think that any substantial error was committed as respects the evidence.

Was the verdict excessive? The verdict was for $3500 as above stated. According to plaintiff's evidence deceased was a fairly good provider; that he was kind to and considerate of his family; that in season he hunted and trapped the greater part of the time, but that through the summer he did odd jobs about town and plowed some, cut wood, etc. Plaintiff was thirty-nine years old and deceased was forty at the time of his death. Plaintiff and deceased had two children, a married daughter and a son fifteen years old. The record shows that deceased was the largest fur producer in the county where he lived; that in the year 1925 he sold furs and rabbits to the amount of $1300, and that in 1924 to the amount of $1100. That there is no substantial merit to the assignment based on an alleged excessive verdict is apparent.

The judgment should be affirmed and it is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.