In re Holt County Bank of Mound City, Missouri, Fred Cottier, Claimant, Appellant, v. S. L. Cantley, Finance Commissioner et al., Respondents.—88 S. W. (2d) 207.

Kansas City Court of Appeals.   December 2, 1935.

*Pettijohn & Eiser* for appellant.

*K. D. Cross* for respondents.

TRIMBLE, J.—The Holt County Bank of Mound City was, on January 11, 1932, found to be insolvent, and was placed under the control of the Commissioner of Finance who put W. H. Weightman, Special Deputy Commissioner, in charge of its affairs. A claim was filed with him for $6,659.21 by the plaintiff herein, and the Special Deputy Commissioner allowed it as a common claim.

This suit, filed May 26, 1932, is to have said claim declared entitled to a preference and allowed as such. The case was, on May 19, 1933, tried by the court, but preference was denied. Whereupon plaintiff appealed.

The evidence shows that at all times referred to in plaintiff's petition, he was Collector of Holt county and whenever deposits were made to his account, said bank had money on deposit largely in excess of the amount due plaintiff, and when the bank closed and its

property went into the hands of said commissioner, the amount going into his hands was much greater than the amount due plaintiff; that no disposition of the assets of said bank has been ordered or made so that the amount then and now due plaintiff augment the sum going into the hands of, and now held by, the commissioner.

It seems that about August 26, 1931, the bank closed its doors for a short time but was allowed by the Finance Commissioner to reopen on October 6, 1931, after it had complied with certain requirements of his, among which was the putting of $40,000 into the capital of said bank and taking out about $55,000 worth of doubtful notes.

Plaintiff, as Collector of Holt county, had always, during the time he was collector, kept an account in the bank, and after its temporary cessation of business, and the bank had reopened, plaintiff testified that about the middle of December, 1931, he told Mr. Porter, vice president of the bank, that he would not send any tax receipts for collection and deposit unless the directors of the bank would give him a bond to pay him all the funds it collected, and gave him a form of such bond which he took away with him for the directors to sign. The evidence is, however, that no such bond was given, but on December 22, 1931, Mr. Smith, the president of the bank, wrote plaintiff saying the directors felt they had done so much to aid the bank in getting in a position to resume business, and as the bank was now safe beyond question, they did not feel they should give a personal bond for the tax collections. "They feel that the bank is good for the money until the tax is distributed. We do not like to see the funds withdrawn for that time as the low price of farm commodities does not bring back enough money to offset the outgo, and it makes the strain heavy over the end of the year. You will distribute the money by January 10th anyway, and as most of the local collections will go to the school funds that will remain here, I am asking that you accept the enclose(d) personal bond signed by myself and allow us to credit your account here with the balance of collections." Enclosed with this letter was a guaranty, or bond, signed by Mr. Smith only. Plaintiff stated, on cross-examination, that the letter "didn't mean anything to me," and, though the bond as he had requested was not sent, he knew collections of such taxes were placed in the bank to his credit and took no steps (from the 22nd of December, 1931, when the president's letter informed him the directors would give no bond, until January 11, 1932, when the bank closed again), to remove his account from the bank, except two checks, one for $200, dated December 24, 1931, and another for $6,762.31, dated January 19, 1932, the last being after the bank had closed and had been put into the hands of the Finance Commissioner, a week and one day after it was found to be insolvent. No doubt this last check was drawn in an attempt to get claimant's money out when

the news of the impending crash became noised abroad. On this check is printed above the signature of plaintiff these words: "I hereby certify that sufficient funds are on deposit in above bank in my name to cover amount of this check."

In addition to this, letters between plaintiff and the bank show that tax receipts were sent to the bank and collections were made, and receipts being delivered to the property owner entitled to them, the money was deposited in the bank to the credit of plaintiff. In fact, the amount in the bank to the credit of plaintiff when the bank went, as stated insolvent, into the hands of the commissioner was $6,659.21. Manifestly, plaintiff knew, during the time the bank was open, clear on down to the time it finally closed, that taxes were being collected and deposited to plaintiff's account in the bank and plaintiff's receipts as collector were being delivered to the taxpayers. Although plaintiff did inform the vice president that he would allow the bank to deposit any money so collected on receipts for taxes if the directors would execute a bond to secure to him the payment of said money when wanted, yet this the directors refused to do, but nevertheless the bank, to plaintiff's knowledge, continued to make deposits therein to the account of the collector.

It is true Mr. Smith sent his personal bond but this was not an obligation of the bank, nor did plaintiff reply that it was accepted in lieu of what he had said he would require, nor did he make any reply whatever. Matters went along thereafter as they had gone before. Even if plaintiff silently accepted Smith's personal bond in lieu of what plaintiff had requested, it could have no effect to bind the bank, or affect the management of its affairs by the Finance Commissioner after he had taken charge because of the bank's insolvency, nor would it confer on plaintiff any right to a preference above the other depositors. The only effect Smith's *personal* bond would have, if any (and we are not deciding this), would appear to entitle plaintiff to rely on Smith himself for whatever remained due on plaintiff's deposit account after he has received all that is payable or derived from his common claim. The fact that the funds deposited were from taxes paid in, and were sums belonging to plaintiff *as collector* give him no preference, unless they were deposited under such conditions and circumstances as would, in *equity*, create the right to a preference, and thereby bind the bank and its other creditors. In the absence of any such facts or conditions, even the deposit made by a trustee is considered a general deposit, and if the bank fails to pay it, the trustee has no particular claims or rights over other creditors. And this is true even when the deposit is a public fund made by an official charged with its custody. [Wheelock et al. v. Cantley, State Commissioner of Finance, 50 S. W. (2d) 731, 734; William R. Comton Company et al. v. Farmers Trust Co. et al., 220 Mo. App. 1081;

1178

Special Road District No. 4, et al. v. Cantley, Commissioner, 223 Mo. App. 80.] (In the case last cited, the funds were illegally and wrongfully deposited and the preference was allowed because there was a principle of equity which permitted a preference.)

The case of Deal v. Bank of Smithville, 52 S. W. (2d) 201, cited and relied on by appellant is not applicable to the case at bar, for the reason that in the Deal case the deposit was made without any authority from the collector whatever, so that the deposit was made wrongfully, i. e., without any authority whatever. The bank, in that case, promised to remit the money as soon as it was collected and there was no agreement with the claimant to make a deposit, hence it was wholly unauthorized and claimant, for that reason, was allowed a preference. Such is not the case now before us. There is ample evidence in the record here to justify the trial court in finding as he did, and in denying a preference. The judgment is therefore affirmed. All concur.