# THE STATE v. W. T. ROLLINS, Appellant.

### Division Two, March 15, 1910.

1. **INFORMATION: Murder: All Lower Degrees.** An information for murder in the first degree embraces every grade and every degree of criminal homicide, from the highest to the lowest; and where it charges murder of the first degree, the prosecuting attorney may elect to proceed for murder in the second degree only; and the court, in such case, after hearing the evidence, may instruct for manslaughter in the fourth degree due to the defendant's culpable negligence as an officer.

2. **OFFICER: Right to Arrest.** Any discussion of the right of an officer to make an arrest without a warrant, for a misdemeanor committed in his presence, and in regard to his right to employ force and to resort, when necessary, to extreme measures. to overcome resistance, is *dehors* the facts, where the offense was not committed in the officer's presence, and he made no reasonable attempt to make an arrest, did not notify the deceased that he wished to arrest him; and there was no resistance, and he testified he shot through the door to intimidate deceased.

3. ————: ————: **Criminal Carelessness.** In such case the fact that defendant was an officer and that he had been notified that deceased was making a disturbance at the boarding house, and that he went there for the purpose of arresting him, and all the facts preceding the subsequent shooting of deceased through the door of his room, may be developed as a basis for an instruction in his behalf on the question of his culpable negligence in killing deceased, but they do not require the court to instruct on behalf of the State that he had a right to arrest deceased and to use force, etc.

4. **PUNISHMENT: Assessed By Court.** Where the jury found defendant guilty of manslaughter in the fourth degree, but failed to assess his punishment, it was competent for the court to assess it at two years' imprisonment, and sentence him accordingly.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort,* Judge.

AFFIRMED.

*W. S. C. Walker* for appellant.

For the State the court gave four instructions, none of which was based upon the relation or rights of an officer in arresting one charged with crime. The instruction which defines the offense under the theory of the State simply attempts to define culpable negligence, and instructed the jury to convict the defendant if he killed the deceased under such circumstances as constituted culpable negligence. There was no instruction which gave the case to the jury upon the theory and fact that the defendant was an officer engaged in trying to make an arrest.

*Elliott W. Major,* Attorney-General, and *John M. Dawson,* Assistant Attorney-General, for the State.

The evidence of the State and the evidence for the defense coincide and present the sole question of the "culpable negligence" of the appellant to the jury. The evidence as a whole reveals the fact that the appellant did not intend to kill the deceased, and did not suspect that he had killed him, and the case went to the jury alone upon the "culpable negligence" of appellant.

GANTT, P. J.—This prosecution was commenced by information in the circuit court of Dunklin county, April 21, 1908. The information charges murder in the first degree of J. A. Leftwich at said county on the 19th of October, 1907. Afterwards at the May term, 1908, the prosecuting attorney elected to proceed for murder in the second degree only, and thereupon the defendant was duly arraigned and pleaded not guilty. At the same term he was put upon his trial and convicted of manslaughter in the fourth degree, and sentenced to the penitentiary for two years. From that sentence he has appealed in due form.

The facts are not intricate, indeed there is little substantial conflict in the testimony for the State and that for the defendant. The evidence shows that on the 19th of October, 1907, the defendant was the marshal of the town or city of Cardwell, in Dunklin county, and that Mr. J. A. Leftwich, who was designated by all the witnesses as the old man, arrived at said city on an afternoon train. He was somewhat intoxicated, enough so as to talk loud and boisterous. He obtained lodging at the hotel of Mrs. Brewer. After supper that evening, he sat and talked with her and her daughter, Mrs. Williams, until about nine o'clock, and then retired to his room up stairs. Sometime after he had gone up stairs, Mrs. Brewer and her daughter heard a disturbance up there, and went up and found Mr. Leftwich holding Williams, the husband of Mrs. Williams, and swearing and cursing him. Mrs. Brewer was afraid he would hurt Williams and got between them and sent Williams down stairs and out of the way. After that Mrs. Brewer succeeded in quieting Leftwich and got him to lie down on the bed. He had taken off his coat and shoes and Mrs. Brewer stayed by the bed to keep him quiet, but it appears that Mrs. Williams, the daughter, had become very much excited and she telephoned for the marshal, and being unable to reach him in that way she sent a Mr. Nichols, a boarder in the hotel, after the marshal. The testimony shows that Nichols found the defendant, the marshal, at the restaurant of John Warren; he called the defendant out and said to him: "There was a man down at Mrs. Brewer's, who had run Mr. Williams away from there and threatened to shoot him, and Mrs. Brewer wanted him (the defendant) to come down there and take charge of the man." Defendant said he would be there in a minute; to which Nichols responded: "Minute nothing, she wants you right now." In a few minutes, the defendant came out of the restaurant and started to the hotel with the witnesses

by the names of Barger and Nichols. Before starting, however, defendant gave Barger his revolver and borrowed another revolver from a Mr. Pool. Before going directly to the Brewer hotel, the defendant left the other two men on the street and went to the home of Henry Osborn, a son-in-law of Mrs. Brewer's, and waked him and said to him: "I have come over to get you to help take a man out of your mother-in-law's house. He is raising thunder and has got a big gun on him. I do not know much about the house. I do not know how to get around in there." Defendant then waited until Osborn dressed and he and Osborn, Barger and Nichols all proceeded to the Brewer hotel. Upon arriving at the hotel, there was no unusual noise, but he went right on up the stairs, and according to his evidence there was no light in the hall, except that which came from an open door in the left hand room at the head of the stairs. The evidence varies somewhat as to the point at which he met Mrs. Brewer and Mrs. Williams. Mrs. Brewer says she passed him about the second step going down from the top, Mrs. Williams having gone in advance. The defendant says that when he started up the steps, he saw Mrs. Williams standing out in front of the door in the light which came from the lamp in the room in which the deceased, Leftwich, was, and she called to her mother and said, "Mama, come on, here is the marshal now," and he went right on up. He said nothing to Mrs. Williams, because just about that time Mrs. Brewer was coming out of the room and he considered her the one to consult, and he thought he met her something like half way down the steps. The stairway consists of about eight or nine steps and he said to Mrs. Brewer, "Where is that man, and what do you want me to do with him?" and she said, "He is up there in that room; I want you to take him out of my house." "I do not remember that I said all right, but that is what I meant, if I did not say it, and passed

on." Mrs. Brewer says that when the marshal came she was up stairs sitting by the side of the bed with Mr. Leftwich, the deceased. When the marshal came her daughter said to her, "Mama, the marshal has come," and she turned to the deceased and said the marshal is coming, and she got up and started to the door which was open. If the deceased said anything she did not remember it. He was lying on the bed when she told him the marshal was coming. When she came out of the door, she did not remember closing it. When the door to the room is pushed back far it will catch to the ceiling. She remembered when she first went in she pushed the door back and it caught against the ceiling. She does not remember exactly where she met the defendant and the other two men, Barger and Osborn, but if it was not right at the landing it was on about the second step, or at least she halted on the second step from the top. As she passed the defendant he had a pistol in his hand and Barger also had one in his hand. She had no recollection of saying anything to the defendant about what to do with Mr. Leftwich. The first words that she remembers saying was after the second shot was fired, when she asked, "Have you killed him?" Then she started down stairs. It all happened so quickly she could not tell what time passed between the first and second shots, but after the second shot she went down stairs rapidly and was in the hall below when the third shot was fired. According to her recollection the defendant was nearly opposite the door to the room in which Leftwich was, nearly in front of it, when he fired the first shot. She did not see anything more. She says she heard the defendant say "Halt" before he shot and kicked the door after the first shot.

According to the defendant's testimony, when he got to the top of the stairs he went in front of the door and stood in front of it with the pistol in his hand. He says the door was not entirely open but

about half open, but he saw Leftwich standing up and the old man started towards the door. He details what happened in this way: "I thought I would stop him and I throwed the gun up with both hands, and he got so near to the door that I told him to halt or stop and I seen he was not going to stop at any rate and I pulled the gun off immediately and fired and he never made any halt, he just come ahead and by that time he got to the door, well, that surprised me because he was very close to me when I shot. I had no intention of killing him then, of course I could have done it, but I did not want to any way. I thought he would stop, but as he slammed the door to he did not get it fastened it caught my pistol and I kicked the door with my foot until I got it open, when I kicked on it, he did not have sufficient hold on it to hold it to but the door went open and come back." By the opening of the door he got his pistol free and tried to push the door open, then he says: "I just stepped back behind the door, facing like, and fired a couple of shots through the lower part of the door and I thought they would intimidate him some more —— a fellow does not know just exactly what he will do in a case like that." Asked for what purpose he shot the two shots through the door, he answered: "I did not want to hit him; did not want to kill him; his mere action in coming towards me did not make me want to kill him. He did not want to do any thing more than shut the door." He stated further that after he fired those two shots he heard no further movement in the room and thereupon he went down stairs. There is no pretence anywhere in the evidence that Mr. Leftwich had any pistol in his hand when he approached the door at the time the defendant fired the first shot over his head, as he states, and the burden of the evidence tended to show conclusively that he had no pistol anywhere at that time in his room. Asked why he went down stairs

226 Sup—34

after the shooting without attempting further to arrest Mr. Leftwich, or to see the effect of his shots, defendant said, "Because I thought he had got the door fastened on him, and I did not know but what he had a pistol, and then I thought that may be he did not have his pistol when he came towards the door, and I thought he was getting it and the lamp had gone out in the meantime, and it was dark, and I knew if he tried to get it or did get it, I would have fifteen feet going right down those steps getting out of his way." When he reached the foot of the steps he called to Barger, who was still standing up in the hall and said, "Come down from there, you are liable to get filled full of bullets through that door," and he came down. "I told him that fellow might shoot through the door and he would get hurt." After the shooting was over and everything was quiet in the room, Mrs. Brewer tried to get the defendant to go back and see what had happened, she thought Leftwich was killed, but defendant answered: "You need not be a bit of afraid of that. I did not shoot to hit him. I shot too low down in the door to hit anybody. I know I did not hit him the first shot because the door was standing open, and you need not be alarmed about the others, because I fired them in the lower part of the door." He told her that Leftwich was quiet then and he did not think it was necessary to go back; that he was not likely to raise any more disturbance and have to be locked up, and that he did not want to arouse him any more. But Mrs. Brewer insisted so much that he told her he would go and get a search light, so he could see him and not make himself a mark for him. He attempted to get a search light, but could not find one. After he came back from the search for a search light, he told her that he thought possibly the old man had gone to sleep now; that he understood he was a very good man when he was not drinking. He then left the hotel; he told her if she needed him to send for him or telephone for him.

Mrs. Brewer and her daughter, Mr. Williams and Mr. Elliott and Nichols sat up the remainder of the night and did not go to bed. Mrs. Brewer testified that she tried to get the defendant, Osborn and Barger to go back, but they were all afraid and none of them would go up. The next morning Mrs. Williams went up and discovered the man was killed. Mrs. Brewer testified that she never made any complaint against Leftwich for the violation of any State ordinance. She had known him since the early spring. She testified Leftwich was not drinking to amount to anything when he went up to his room, they said he had whisky with him, but she never saw it. And Mrs. Williams corroborated her in that respect. Mrs. Williams testified that she left immediately after the first shot was fired and ran out into the yard; she heard the last two shots close together. None of the witnesses heard the defendant say anything to the deceased before he shot except, "Halt," and the defendant does not claim to have said anything else.

Mrs. Williams testified that she went up to the room next morning, went around on the porch and looked in at the window and saw the deceased lying there in a pool of blood. His head was next the door and his feet out towards the window. His head looked like it might have been just opposite the bottom bullet hole in the door. She testified that the last bullet hole in the door was about a foot and a half from the floor and the other was about two and a half feet.

Elliott testified that he was in the room just across the hall from where the shooting took place. His regular room was the room Leftwich was occupying. When the defendant came up the stairs Leftwich was lying on the bed. When Mrs. Brewer told Leftwich the marshal was coming, he got up and came towards the door. He did nothing but come towards the door. He was just like any one walking towards the door. Rollins stopped when he got in front of the door.

Rollins could have seen Leftwich from where he stood while Leftwich was coming towards the door. The only thing Rollins said was, "Halt." Leftwich said nothing. Elliott did not see the door close because when the first shot was fired he turned. He did not hear the defendant say anything after he fired the first shot. This witness also looked through the window next morning and saw Leftwich lying on his back with his head towards the door, pretty nearly against it. This witness did not hear any conversation between Rollins and Mrs. Brewer. The reason he did not go into the room after Mrs. Brewer requested him to was because he was "kinda scared" of him. This witness and Mrs. Brewer and perhaps another witness testified that the defendant appeared to have been drinking, somewhat intoxicated.

Dr. Mason testified that he went to the hotel on Sunday morning after the shooting and found Leftwich lying in the room with his feet towards the window in the north and his head very close to the door. The door was slightly ajar, not fastened; he pushed the door sufficiently to get in, and after getting in drew the body away from the door sufficiently to allow any one to get in. He found a wound in the head of the deceased; it was on the left side just back of a line drawn from the center of the head down to the ear, just back of what is called the posterior median line. He did not use a probe, but his judgment was that the ball took a backward direction towards the base of the brain. A man could not live very long with such a wound. His opinion was that the man had been dead practically all night, six or eight hours. If the bullet that made the lower hole in the door struck the deceased he must have been in a crouching position with his head very close to the door. His opinion was that there would be some movement on the part of the deceased after receiving such a wound, that he shifted his position after he was shot. His head was not in a

position to be hit by the lower bullet at the time he first saw the body.

The coroner testified and described the wound as Dr. Mason had, and stated that he made an examination with a probe. The wound was in the left side of the head near the median line over the ear, and the bullet had penetrated the skull and gone through the brain and lodged somewhere near the base of the skull inside; it ranged a little backward. Death was practically instantaneous. From a wound of that kind deceased might have struggled some in dying as there is some reflex action in the muscles of all animals. This was practically all the evidence in the case.

The court submitted the case to the jury for manslaughter in the fourth degree by reason of culpable negligence and gave the usual instructions as to the competency of the defendant to testify in his own behalf; as to the right of the jury to judge of the credibility of the witnesses; the presumption of innocence and reasonable doubt, and an instruction as to the right of the jury to weigh the several statements of the defendant in the case.

On the part of the defendant the court gave the following two instructions:

"2. The court instructs the jury that the defendant, W. T. Rollins, on the 19th day of October, 1908, was the city marshal of the city of Cardwell, in Dunklin county, Missouri, and as such officer had the right, and it was his duty, to arrest any person violating the ordinances of such city, or the laws of the State. And if you find from the evidence, that the deceased, J. A. Leftwich, was boisterous and disturbing the peace of the household of Mrs. P. R. Brewer, and that defendant was called in to arrest him and remove him from said house, then defendant had the right to make such arrest.

"3. The court instructs the jury that if you believe from the evidence, that the wound that occa-

sioned the death of J. A. Leftwich was the result of misadventure, and if you further find that the defendant discharged his said pistol at and towards the bottom of the door of the room in which J. A. Leftwich then was, and that defendant fired off his said pistol with the intention upon his part of intimidating the said J. A. Leftwich so that he would submit to lawful arrest at the hands of the defendant, and at the time of such discharge of said pistol, the defendant had no reason to believe, and did not believe, that the shot so fired would strike or wound the said J. A. Leftwich, you cannot find the defendant guilty of manslaughter in the fourth degree unless you shall find and believe from the evidence that defendant was culpably negligent, that is, unless you find and believe from the evidence that defendant was guilty of a recklessness and carelessness incompatible with the proper regard for human life.''

The defendant also asked another instruction which the court refused, and which will be noted further on in the course of the opinion.

I. The information was in all respects sufficient. An indictment or information for murder in the first degree, under our statutes, embraces every grade and every degree of criminal homicide from the highest to the lowest. [State v. Moxley, 115 Mo. 1. c. 651; State v. Scheiller, 130 Mo. 510; R. S. 1899, sec. 2369.] The prosecuting attorney in this case, elected to proceed for murder in the second degree only. This he had the right to do, and the court after hearing the evidence, instructed for manslaughter in the fourth degree caused by culpable negligence. It was entirely competent for the court to instruct the jury as to this lower degree, notwithstanding the information was for the highest degree. [State v. Frazier, 137 Mo. 1. c. 340, 341; State v. Feeley, 194 Mo. 1. c. 323, 324.]

This instruction, however, is assailed by the defendant for another and a different reason, namely,

because it did not contain the law governing the rights of an officer making arrests. It will be noted, however, that in the statement of the case, the court gave two instructions on behalf of the defendant in regard to his right as a marshal to arrest a person violating the ordinances of the city. And in the instruction numbered three given for the defendant, the jury were told that if the defendant fired his pistol with the intention, upon his part, to intimidate the said J. A. Leftwich, so that he would submit to lawful arrest at the hands of the defendant, and at the time of such discharge of said pistol defendant had no reason to believe and did not believe that the shots so fired would strike or wound the said Leftwich, the jury could not find him guilty of manslaughter in the fourth degree, unless they should find and believe from the evidence that the defendant was culpably negligent. That is, unless they should find and believe from the evidence that he was guilty of a recklessness and carelessness incompatible with the proper regard for human life. This last clause of this instruction in substance simply reasserts all that the court submitted to the jury in its first instruction given of its own motion. While a great deal has been said in regard to the right of a peace officer, such as the marshal in this case was, to arrest without warrant for a misdemeanor committed in his presence and in regard to his right to employ force and to resort, when necessary, to extreme measures in overcoming resistance, it seems to us, after a careful reading of every word of this record, that that discussion is *dehors* the facts in this case. The offense, if any, committed by Mr. Leftwich, certainly was not in the presence or view of the defendant, nor was there the slightest evidence of any resistance of the officer by the deceased. The defendant himself says in his own testimony that when the deceased approached the door of the room, which he was occupying, when the officer fired the first shot therein, ''He did not want to do anything

more than shut the door.'' There was then not the slightest ground for anticipating any resistance and the old man was entirely unarmed.

Moreover, the court did not predicate the guilt of the defendant in the most remote degree upon his want of right or power to make an arrest. On the contrary, the court instructed the jury that if the deceased was boisterous and disturbing the peace of the household of Mrs. Brewer, and the defendant was called in to arrest him and remove him from the house, he had a right to make such arrest. The only part which the right to make an arrest played in this case was that of tending to show the rightfulness of the defendant at the scene of the homicide and the absence of all malice towards the deceased. But when defendant invokes the doctrine of the right of arrest, he overlooks the fact of his failure to make an arrest or any reasonable effort to make an arrest. Section 2540, Revised Statutes 1899, provides: ''An arrest is made by the actual restraint of the person of the defendant, or by his submission to the custody of the officer, under authority of a warrant or otherwise. The officer must inform the defendant by what authority he acts, and must also show the warrant if required.'' Section 2541 provides: ''If, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all necessary means to effect the arrest.'' [State v. Green, 66 Mo. l. c. 649 et seq.]

All the testimony in this case tends to show that the officer, at no time indicated to the deceased that he had come to arrest him. On the contrary he says himself that the only thing that he said to the deceased was, ''Halt,'' and then fired over his head. He says the deceased was merely coming to shut the door. He was making no effort to evade arrest or escape from the officer. According to the defendant's own evidence, he was not called upon to use his revolver to compel a submission to arrest, nor did he use it for any such

purpose. He simply fired the revolver three times into the room where the unarmed man was without once notifying him that he wanted to arrest him, or required his submission to arrest. The court took the most favorable view of the case and submitted it to the jury solely upon whether such conduct amounted to culpable negligence, and the jury, as abundantly justified by the testimony, found that it was. We think there is no error whatever in the instruction given by the court, and the defendant had the full benefit of the law authorizing him to make an arrest. Taking the most favorable view of the defendant's own testimony, it is too plain for doubt that he did not shoot and kill the deceased in an effort to arrest him. He says himself that he did not fire the pistol shots for any such purpose, but merely to intimidate and frighten him, and had no intention whatever of killing him, so that, as already said, the right to kill, if necessary in making an arrest, has nothing to do with the case as presented on this record. The sole and only question is whether the court correctly submitted to the jury the question whether the defendant was guilty of negligence and carelessness in firing into the room of the deceased as he did, and showed a lack of regard for human life, or as he put it in his own instruction, was guilty of a recklessness and carelessness incompatible with the proper regard for human life, and this certainly was the most favorable view that could have been taken of the conduct of the defendant on this occasion.

II. There is no merit in the criticism of the third instruction given by the court of its own motion on the credibility of the witnesses. And the same may be said to the complaint of the fifth instruction given by the court in regard to verbal statements made by the defendant. They were entirely proper.

III.   Complaint is made of the refusal of the fourth instruction requested by the defendant. Without reproducing this instruction at length, as it would occupy a whole page of printed matter, it is sufficient to say that it was properly refused, because it submitted to the jury various hypotheses which were entirely unsupported by the testimony in the case, and was at best a comment upon the testimony which would have been improper for the court to have made. Moreover, the instructions given by the court of its own motion and on behalf of the defendant fully covered every proposition in the case which was necessary for the jury to consider in arriving at their verdict.

IV.   The jury having failed to assess the punishment after having found the defendant guilty, it was entirely competent for the court to assess the same, as it did. [Sec. 2649, R. S. 1899; State v. Foster, 115 Mo. 448.]

After a careful review of the record we have been unable to find any reversible error therein, and the judgment of the circuit court must be and is affirmed.

*Burgess* and *Fox, JJ.,* concur.