STATE v. SAM R. PARKER, Appellant.—No. 40179.—199 S. W. (2d) 338.

Division One, February 10, 1947.

*Earl E. Roberts* and *Geo. F. Addison* for appellant.

918

*J. E. Taylor,* Attorney General, and *Aubrey R. Hammett, Jr.,* Assistant Attorney General, for respondent.

VAN OSDOL, C.—Jimmie Jordan, nineteen years old, was killed by defendant at about 12:30 the morning of September 26, 1945, on the premises of Earl Carty at Bangert, Dent County. Defendant was convicted of murder in the second degree and sentenced to ten years' imprisonment.

Herein upon appeal defendant-appellant contends that, when the homicide was committed, he was either acting as a member of a posse comitatus or acting in the exercise of a duty as a private person in making an arrest of a felon; and that the only question for the jury's consideration was whether defendant had used more force than reasonably necessary to accomplish the arrest. Defendant-appellant also urges there was no evidence of the malice aforethought essential to a conviction of murder in the second degree.

Defendant had been told by his son, Eugene "Buck" Parker, that Jimmie Jordan ▇▇▇ had suggested the son help steal chickens from the henhouse of Elva Carty, who resides about one-half mile south of Bangert; defendant told Carty, who with defendant and defendant's son went to Salem, where the information was given to the sheriff. Chickens and livestock had theretofore been stolen of people residing in the Bangert community. It was arranged by the sheriff, defendant and Carty that defendant's son should go ahead with the plan proposed by Jordan. The sheriff announced his purpose to "catch him (Jordan)" in the act. No express direction was given by the sheriff to defendant to participate in the apprehension or arrest of Jordan, but the sheriff testified, defendant "could have taken it that way." The sheriff testified, the purpose of Carty's and defendant's presence "was to direct me and show me where all this was going to take place." And soon after dark September 25th, the sheriff, his deputy Redwine, defendant and Elva Carty were in wait near Elva Carty's barn. All were armed, the defendant with a twelve-guage double barrelled shotgun. After waiting two or three hours, they observed a man (Jordan), who entered the Carty henhouse, came out with two chickens, and ran away in the darkness. Some guineas raised a commotion, and Jordan was afraid to return to Elva Carty's henhouse for more chickens. He suggested to defendant's son that they should go to the farm of Earl Carty at Bangert and there get some chickens known to be roosting in the barn. Defendant's son upon some pretext left Jordan and told the sheriff of this change in Jordan's plans, and then rejoined Jordan. The sheriff's party then went to the premises of Earl Carty and there con-

cealed themselves at various positions within the Earl Carty barn. Defendant, having entered the barn by climbing over or going through a gate across the entrance and gangway of the barn, turned left through a small gate into the cow stanchions through which Jordan would have to go to approach the roosting chickens. In order to reach the chickens, it would have been necessary to stand upon the mangers of the cow stanchions. It was planned that the members of the sheriff's party would wait until Jordan had climbed upon the mangers, and all were then to rush upon and seize him. The sheriff had instructed his deputy Redwine in the presence of defendant, "Don't shoot unless you have to, but if you do, shoot low . . . We don't want to hurt him." Within a few minutes, Jordan and defendant's son approached the barn. Jordan climbed over the gate across the gangway at the entrance of the barn, and passed to the left through the small gate into the cow stanchion occupied by defendant and there hesitated momentarily. Defendant, thinking Jordan had seen him, "shined the light (of a flashlight) in his (Jordan's) face and asked him to stop where he was . . . he ran out this small gate . . . and jumped up on this gate (across the gangway) . . . and fell over down onto the ground." There was evidence defendant twice called to Jordan to "stop." When Jordan, then running on "all fours," had reached a point about eighteen and one-half feet from the barn, defendant fired, striking Jordan in the right side just under the armpit, the charge of No. 6 chilled shot "ranging upward" in Jordan's body. "Right there after" the shooting occurred, the defendant said, "Well, he was getting away . . . I didn't aim to kill him, I was drawing to the right of him."

■ In a proper case the sheriff can summon to his aid in the performance of his duty the "posse comitatus," or the whole power of the county, and persons so called upon are bound to aid and assist him. Statutes empowering a sheriff to summon suitable aid in the suppression of disturbances of the peace have been held to be an affirmance of the common law by which the sheriff might raise a posse comitatus. 57 C. J., Sheriffs and Constables, sec. 123, pp. 773-774; 24 R. C. L., pp. 923-924; 47 Am. Jur., Sheriffs, Police, and Constables, sec. 36. See Section 12821 R. S. 1939, Mo. R. S. A. sec. 12821. And those orally deputized by a sheriff to aid him in making an arrest for felony are neither officers nor mere private persons, but occupy the legal position of a posse comitatus. But generally, it would seem, a member of a posse comitatus, while co-operating with the sheriff and acting under his orders, is ■ clothed with the protection of the law as is the sheriff. Robinson v. The State, 93 Ga. 77; 47 Am. Jur., sec. 36, supra. "Nor is the protection the law affordeth him confined to his own person. Every man who cometh in aid of him (I speak here principally of such officers as at common law or by the appointment of the Crown are properly conservators of the peace),

—every man lending his assistance for the keeping of the peace, or attending for that purpose, whether commanded or not, is under the same protection as the officer himself.'' Foster on Crown Law, 3d Ed., p. 309; 1 Hale P. C., p. 463; Vol. 13, Criminal Law Magazine and Reporter, p. 198.

In the case of State v. Havens, Mo. Sup., 177 S. W. 2d 625, the court discussed the necessary means an officer is justified in using to effect an arrest. See Section 4379 R. S. 1939, Mo. R. S. A. sec. 4379. It was said an officer may use no more force than is reasonably necessary to accomplish the arrest. And to justify the killing of an offender, the exigencies of the situation must have been such that there was a necessity for the killing and whether such a necessity existed, as a matter of fact, is a question for the jury to be determined from all the evidence of the case, a doubt as to the nonexistence of such necessity entitling the officer to an acquittal, citing State v. Montgomery, 230 Mo. 660, 132 S. W. 232. Distinctions exist with respect to the authority to make arrests, among other factors, between officers and private individuals (the authority of officers naturally embracing and exceeding that of private citizens); with respect to the grade of the offense, if any, committed, whether a felony or a misdemeanor; and whether committed within the view of the person making the arrest. State v. Nolan, 354 Mo. 980, 192 S. W. 2d 1016.

In State v. Albright, 144 Mo. 638 at page 649, 46 S. W. 620 at pages 622-3, the distinction is noticed between officers and private individuals with regard to their authority to make arrests for felonies.

''In the case of an officer, as sheriff and the like, the law enjoins on him as a duty to make arrest of one who has committed a felony, or one whom he has reasonable cause to suspect of having been guilty of a felony. 2 Hale, P. C. (85), (86).

''The chief distinction between an officer and private person making an arrest in the circumstances above mentioned, is that in the former case the making an arrest is a matter of *duty*; in the latter, a matter of mere *right*. The only exception where it becomes the duty of a private person to arrest or attempt to arrest a felon, is where the felony is perpetrated in his presence. 1 Hale, P. C. 588, *supra*. Otherwise the officer and the private person stand on the same footing, and are equally under the special protection of the law when making or attepting an arrest. And it is said that a private person when making an arrest for a felony, must notify the felon of his purpose and that having thus notified the felon, he may kill him if he either resists or flies. *State v. Bryant,* 65 N. C. 327.''

In the instant case, it was the theory of defendant that he was assisting the sheriff at the sheriff's summons and request in an endeavor to apprehend Jordan in the commission of a felony, and to effect the felon's arrest. The trial court recognized the defendant's theory of defense and instructed the jury at defendant's instance

(Defendant's Instruction No. 3) if they found defendant accompanied the sheriff of Dent County to the Elva and Earl Carty farms'for the purpose of assisting him in apprehending a chicken thief, then and in that event the defendant had the same authority as the sheriff would have under the same or similar circumstances; and that if the sheriff and his assistants had probable cause to believe and did believe Jordan was guilty of the offense of stealing chickens in the nighttime, then and in that event it was the duty of the sheriff and his assistants to arrest Jordan after notice of intention so to do, and if he fled then the sheriff or defendant "had the power and it was their duty to use all necessary means to effect the arrest, or prevent the escape therefrom, even to the taking of life, the killing would therefore be justifiable and you should find the defendant not guilty." The jury were also instructed upon the crime of manslaughter, the instruction hypothesizing the intentional killing of Jordan without malice and without premeditation, and under circumstances not justifiable or excusable.

 It is thus seen that defendant had his theory of the defense of justifiable homicide in effecting an arrest fully embraced in the given Defendant's Instruction No. 3; and further the defendant had the benefit of the submission of manslaughter in the event the jury had believed defendant, although not actuated by malice, had nevertheless used force not reasonably necessary to accomplish the arrest, that is, in the event the jury had believed defendant, although acting without malice aforethought, was not justified under the circumstances in shooting Jordan. (We observe Defendant's Instruction No. 3 was not artfully drawn; and it was erroneous in a respect of which defendant has made no complaint.)

 Defendant in his brief herein on appeal contends the jury should have been instructed that, although they believed defendant was not aiding and assisting the sheriff at the sheriff's request, nevertheless *as a private person* defendant was under a duty to effect the arrest of one who had recently committed a felony in defendant's presence and of one who was then engaged in the commission of another felony. The defendant did not present but should have presented this contention "in detail and with particularity" in his motion for a new trial (Section 4125 R. S. 1939, Mo. R. S. A. sec. 4125), in order to have the contention reviewed upon appeal, regardless of whether the contention relates to a question "of law arising in the case" upon which the court "must instruct" (Section 4070 R. S. 1939, Mo. R. S. A. sec. 4070) or a "point of law arising in the cause" upon which the "court may instruct" (Section 4083 R. S. 1939, Mo. R. S. A. sec. 4083). State v. Standifer, 316 Mo. 49, 289 S. W. 856; State v. Foster, 355 Mo. 577, 197 S. W. 2d 313.

 The trial court also submitted the question of defendant's guilt of murder in the second degree, of which crime defendant was

convicted as stated. The existence or nonexistence of *malice* determines whether homicide is murder or manslaughter. State v. Foster, supra; State v. Ferguson, 353 Mo. 46, 182 S. W. 2d 38; State v. Gadwood, 342 Mo. 466, 116 S. W. 2d 42; 40 C. J. S., Homicide, secs. 35b, 45; Vol. 1, Warren on Homicide, Permanent Edition, sec. 87, pp. 427-429.

■ An additional circumstance and statements of defendant are now examined, which, in connection with all of the facts and circumstances related supra, we hold, are substantial, and sufficient to authorize the submission and sustain the conviction of murder in the second degree. Two or three years prior to the homicide, defendant and the father of Jimmie Jordan had a serious difficulty. Overhearing a discussion among the officers of the necessity of holding an inquest, defendant said, ''Well, . . . I shot the boy, I admit that . . . I am the one to take the blame.'' A witness stated defendant, when producing his shotgun to the officers subsequent to the homicide, indicated the right-hand barrel and said, ''Boys . . . That is the barrel that got him and all I ask of you, I want my gun back, I might have to use it again.'' The deputy sheriff Redwine testified of the conversation between the sheriff and defendant immediately following the shooting, ''the sheriff says 'Well, Slim (defendant), what in the hell did you shoot that boy for?' He said 'You told me to stop him and I stopped him.' He said 'Well, I didn't tell you to shoot him.' He says 'Well, I told him to stop and I stopped him.' He (defendant) says, 'I'll take the blame all on myself, if they want to send me to the penitentiary all I ask of them is to let me out long enough to get another one.' ''

These statements, considered in connection with all the facts and circumstances we have related, are not the words of one who feels himself guiltless because justified in killing to effect an arrest; rather are these statements those of one conscious of guilt. And the statements are not those denoting compunction, as might be made by one who, without malice, has intentionally ■ killed in effecting an arrest, yet feels that under the stress and excitement of the event he has fired too quickly, or unnecessarily. But the statements, in our view, are those of one whose malice or malignancy of purpose had prompted him to intentionally kill without just cause, justification or excuse.

We have found no error in the record proper; and the judgment should be affirmed.

It is so ordered. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.