**STATE of Missouri, Plaintiff-Respondent,**

**v.**

**Merle Eugene PARKER, Defendant-Appellant.**

**No. 8256.**

Springfield Court of Appeals.
Missouri.

April 16, 1964.

Merle Eugene Parker, pro se.

Paul Boone, Pros. Atty., Gainesville, for plaintiff-respondent.

RUARK, Presiding Judge.

The appellant was charged by information, "(Based upon the affidavit of Kelley Sallee)," with common assault in that he did "in a rude, and insolent manner, unlawfully touch and assault" the said Kelley Sallee. He was convicted by a jury in Ozark County; and, the jury being unable to agree upon a verdict, the court fixed his punishment at a fine of twenty-five dollars.

At about the time defendant's counsel filed his brief, the defendant discharged his counsel and requested permission to file his own brief and argue his own case. The request was granted, and the brief was filed. However, it is of little value to us. It is principally concerned with "constitutional questions" none of which were raised in the first instance.

The occasion of this difficulty was a charivari (often spelled "shivaree") held for a pair of newlyweds, Gene Billingsley and his bride, Judy (nee Farnsworth), at the small settlement or village of Thornfield in Ozark County. For the benefit of those who may not be familiar: the charivari (shivaree) is an ancient custom of serenading the bridal couple, which originated in France and was brought to this country in early times. In some localities it became a mock serenade for unpopular marriages and thus a disturbance. See Gilmore v. Fuller, 198 Ill. 130, 65 N.E. 84, 60 L.R.A. 286, and Higgins v. Minaghan, 78 Wis. 602, 47 N.W. 941, 11 L.R.A. 138. In the hill country of Missouri it became (and usually is) a combination of celebration and surprise party by the neighbors for the newlyweds. The surprise was usually announced by the banging on pans or plowshares and the blowing of horns, if available. Sometimes shotguns were fired. When the horse was still essential to our way of life, the surprise was often announced by the "blowing of anvils." [1]

1. With a charge of black powder between two anvils.

Usually the bride and groom were (and sometimes still are) subjected to some good-natured hazing, after which refreshments are served. In this particular instance, the shivaree was held at the house of Judy Jones, a sister of the bridegroom, where the young couple were staying, at any rate on that night. This shivaree appears to have been an invitation affair; at least witnesses testified they were there "by invitation." A large crowd of neighbors and friends were present, a goodly number of them mature men with their families. The crowd included the relatives of the couple and also a group of younger people near the age of the newlyweds. Some mention is made of cake and coffee; on the whole we gather that the shivaree was a combination surprise party and celebration, roughly corresponding to a reception which concluded with "dunking" the newlyweds in a nearby creek.

The settlement of Thornfield is close to, but not on, the state highway. A road leads off to the west, and this road is the main and only street of the settlement. The Jones house sits north of this road about one hundred fifty feet. Cars of the guests were parked on both sides of the road and in the space south of the house and north of the road.

The prosecuting witness, Kelley Sallee, is sheriff of Ozark County. On the evening in question he got a call from Thornfield; and, accompanied by his deputy, Taylor, he went to Thornfield to the home of the caller where he learned that people were setting off dynamite. The two officers went to investigate. They drove past where the cars were parked. They went down by the creek and sat a while and then drove around some. They heard dynamite go off. They drove north of Thornfield on a farm-to-market road about three miles but did not locate the dynamiters. They stopped at a church or schoolhouse and stayed for a while, and then drove back to Thornfield. It was then nine o'clock; the shivaree party was breaking up; the guests were commencing to leave.

*The first incident:* One Judy Jones (this is the second Judy Jones we have mentioned), a young married woman, had been parked north of the road. When the sheriff came along this time, Judy had backed out at an angle across the road with her car (as the sheriff described it) "slaunchwise" across the road. The automobile lights were on and the engine was running. The sheriff drove his car up on the north side of the road and stopped in front of the Judy Jones car. He testified that he told Judy she had the road blocked and asked her to move her car. Judy testified that the sheriff drove up and told her he was giving her a ticket for blocking the road; that her husband interfered and said that if the sheriff would get his car out of the way they would go on home; and that the sheriff said "we wasn't going anywhere." Therefrom ensued a spirited argument between Judy and Sallee as to *who was blocking whom.* A crowd gathered around. Sallee testified the crowd vilified him and used vulgar and indecent language toward him. This is disputed by a number of witnesses who were present with their families, including a man standing nearby holding his two-year-old grandchild. Under the rule which we shall state, it is incumbent upon us to believe the prosecuting witness in spite of strong evidence to the contrary; but we here remark that we consider it to have been an unusual procedure if these people in this farming community, consisting of husbands, wives, children, and grandparents and grandchildren, engaged in any extensive use of vulgar and indecent language and, to quote Sallee, "blackguarding" in the presence of each other. There is no doubt, however, that the gathering was incensed by what they considered, rightly or wrongly, the sheriff's treatment (or mistreatment as the onlookers obviously felt) of Judy Jones. The crowd gave, in the words of one witness, some "utterance." There were some "catcalls" apparently from the younger members of the crowd. The sheriff said that he summoned three boys to appear in magistrate court for "interfering." We are not sure just what this

interference was, but he said that he had trouble getting the ticket written because those persons "just kept vilifying me all the time I was writing it—vilifying me, telling me I didn't have the authority to and things like that." According to defendant's witnesses, the women and girls "sang" to the sheriff.[2] One of the songs was "Kelley was a jolly good fellow" and another "When the roll is called up yonder he'll be there." (We suspect the words were changed somewhat.) Regardless of who did what, or who blocked whom, the sheriff got out his black notebook, laid it on the hood of his car, and wrote Judy a ticket. After that it appears (although it is not very clear in the evidence) that Sallee backed up "just a little" and Judy drove out. It is not contended that defendant was present or had any part in the "discussion" at the Judy Jones car concerning the blocking of the road; but the state went into this incident, the defendant willingly joined, and more record is taken up by this affair than by the actual occurrence which involved the alleged assault. Apparently the parties on both sides considered it important to establish who was right and who was wrong in the "who blocked whom" affair.

*The second incident:* The sheriff drove off. Before he got "half a quarter" he noticed his notebook was missing. The deputy said something about having seen it, or something, fly over the windshield. They turned around immediately and drove back to the scene of the recent argument (a number of the guests were still there), and the sheriff got out and commenced looking in the dark for the missing notebook. For some reason he was unable to find it. (This may have been the occasion when the women and girls "sang" to him.) According to Sallee's testimony, he got back in the car and closed the door, and someone cried, "He's having a flat, he's having a flat." He opened the door and heard the air whizzing out. He went back and saw a knife sticking in the tire. He says, "It made me mad." The deputy says he was

"pretty mad," "awful mad." According to the prosecuting witness, he said, "Well, I can take care of the dirty son-of-a-bitch that stuck that knife in my tire." According to a number of defense witnesses, the prosecuting witness said, "I can whip the God damn son-of-a-bitch that done that." The accompanying deputy said he didn't hear *what* Sallee said. According to Sallee, Gene Billingsley (the bridegroom) had been present at the first incident and was still present in the crowd and, "he *began* to double up his fists and he came towards me and I went towards him then." "I don't believe I had a flashlight in my hand, I think I pulled up my blackjack out of my hip pocket, and just at that time there was about four different ones grabbed me." He said two men grabbed him from behind but he never saw who they were; that the defendant "Gene Parker grabbed me by the left arm and said, 'I'm making a citizen's arrest for you swearing in the crowd—or in public,' and Dick Wallace had me by the right arm." He said he told Parker that the only man in the county who could arrest the sheriff was the coroner; and, "after some persuasion," they turned him loose and he went back to his car. The deputy didn't see just *what* happened. Some eight witnesses for defense testified concerning this affair. In the composite they say that Sallee went through the crowd swinging (but not striking at anyone) a multicelled flashlight. Gene Billingsley (who, according to defendant's evidence, had just come from the house with his bride after changing his wet clothes and having some cake and coffee) laughed at Sallee. Then Sallee started swinging at him with the flashlight; Billingsley had his arm up warding off the blows and was dodging. Sallee then pulled out his blackjack and started to strike, and at that moment Dick Wallace grabbed him and took the blackjack away from him; and defendant Parker stepped in front of Sallee, pointed his finger at him, and said something to him about making a citizen's arrest for swearing in front of the women

---

2. This *may* have been on the occasion of "the second incident."

and children. All these witnesses say that no one grabbed Sallee from behind and all say that *Parker never touched Sallee;* but, if we follow the usually accepted rule, we must assume that they all lied and Sallee, and only Sallee, told the truth, although it is quite distasteful to have to assume that all of these neighbors are perjurers. Wallace (a half-brother of Billingsley) testified that when he saw Sallee get out his blackjack, "I ran over to try to get it stopped as he made the pass at Gene with this blackjack, and caught the blackjack." He said he took the blackjack away from Sallee and Sallee grabbed for it and said, "Give me that and I'll knock the son-of-a-bitch in the head." He said he got Sallee by the arm and told Sallee he'd like to talk to him. They started walking back toward the car, and he gave Sallee back the blackjack. Sallee testified that Wallace did not take his blackjack from him but admitted he had "hold" of it.

All this happened in a very short time, much less than it takes to tell it. Taylor, the deputy, said that he was sitting in the car when Sallee got out of the car. "I looked back and they was kind of scuffling. I got out of the car, but when I got out Kelley was comin' walkin' up to the car, so I don't know what happened back there."

*The third incident:* The prosecuting witness drove up by the store to change his tire. The state introduced evidence of some words had up at that place and as to the fact that someone threw a handful of rocks or gravel at the back of the sheriff's car as he drove off; but it is not claimed that the defendant was present or had anything to do with this incident. The defendant did not object; but, since it has nothing to do with the defendant, we will not relate it in further detail.

Appellant's first complaint is to the overruling of defendant's motion to quash the jury panel on the ground it was summoned by the sheriff, who is the prosecuting witness. It appears from the colloquy that the case had been set for trial at a previous term and continued at the request of the state. On May 13, 1963, summons for the regular panel drawn by the jury commission was issued, and the members of this panel were served between May 15 and May 20. Most of them were served by the sheriff's deputy. Probably three were served by the sheriff, Sallee, himself. On May 13, defendant's counsel had written a letter to the circuit clerk requesting the issuance and delivery of certain subpoenas to the sheriff of Ozark County for service. On the morning of May 21, 1963, when the case was called for trial and the venire was present, defendant's counsel, for the first time, made oral motion to quash the panel because the members had been summoned by the prosecuting witness. He further moved to disqualify the sheriff and have the coroner directed to summon a panel and execute all further process which might be required. Counsel for defendant disclaimed any intention of inferring that the sheriff "has done anything wrong" in the summoning. The court overruled the motion to quash because it came too late. He did disqualify the sheriff from proceeding further and directed the coroner to act in his stead from thereon. (See § 58.190 RSMo, V.A. M.S.) It does appear, however, that he called the jury which had already been summoned into the box without requiring their resummoning by the coroner.

■ If the sheriff is interested in the sense that he is a party, he is not qualified to act, and his disqualification is not a discretionary matter. (Mannon v. Frick, 365 Mo. 1203, 295 S.W.2d 158, 165.) We believe that the sheriff is interested personally if he is the prosecuting witness in a case. (See State v. Powers, 136 Mo. 194, 37 S.W. 936.)

■ But it seems to us that the orderly process of law requires that this interest "be made to appear to the court" within a reasonable time after defendant has knowledge of the interest and opportunity to present it. The supreme court once said that when the defendant in a criminal case desires to object to the competency of a

sheriff to summon a jury he should present his objection before the panel is summoned. (State v. Jeffries, 210 Mo. 302, 109 S.W. 614.) We note, however, this was a "more-over" remark after a finding that the sheriff was not disqualified by his diligence in pursuing and arresting the defendant. We think the proper rule is that the defendant should present his challenge at the first reasonable opportunity after he has knowledge.[3] There are also a number of cases which apply the common-law rule that a challenge to the array must be in writing.[4] Our view of this is somewhat the same as that in reference to challenge prior to summoning. Defendant should not be held to such requirement until and unless he has had knowledge and a reasonable opportunity to act. See Massman v. Kansas City Public Service Co., Mo., 119 S.W.2d 833.

In this case the defendant and his counsel, the prosecuting attorney, and, of course, the sheriff had long known that the sheriff was "interested." But there is no reason to suppose the court or, for that matter the clerk, knew of it. The court stated to the attorneys that he had not known such fact prior to the making of an oral motion. He had not examined the information. Referring again to Mannon v. Frick, supra, 365 Mo. 1203, 295 S.W.2d 158, l. c. 165, that court stated:

"* * * Had he [the defendant] desired an earlier disqualification he should have taken some action; * * *."
and 295 S.W.2d at l. c. 166:

"* * *; it was hardly incumbent upon him [the trial judge] to search

out independently and in advance the relationships, official positions or actions of the parties. Such matters should normally be called to his attention by motion. * * *."

■. In view of the fact that this was the regular venire selected by the jury commission and defendant conceded no wrongdoing of the sheriff in summoning the jury, and in view of the fact that none of the jurors were challenged in the polls [5] because of anything in reference to the summoning, and in view of the fact that defendant waited until the last minute and the venire panel was in attendance, we hold that it was not error for the court to overrule the motion to quash the panel.

■ We have more difficulty with appellant's second contention. The court called the panel into the box without having them summoned or resummoned by the coroner (as *apparently* was done in Mannon v. Frick, supra, 365 Mo. 1203, 295 S.W.2d 158). In State v. Weeden, 133 Mo. 70, 34 S.W. 473, the court disqualified the sheriff and acted as its own elisor in calling the jury previously summoned by the sheriff, instead of having them resummoned by the coroner. This was held to be error. The court said, 34 S.W. l. c. 475:

"* * * Under this ruling it seems somewhat strange that the court itself should call into the jury box jurors who were known to have been summoned by an officer whom it had held to be disqualified, and who, it must have known, were summoned by that officer, and had not been summoned by

3. State v. Page, 212 Mo. 224, 110 S.W. 1057; State v. Rouner, 333 Mo. 1236, 64 S.W.2d 916, 921, 92 A.L.R. 1099; Samuels v. State, 3 Mo. 68; State v. Austin, 183 Mo. 478, 82 S.W. 5; State v. McKinney, 254 Mo. 688, 163 S.W. 822; see Doran v. Ross, 240 Mo.App. 823, 221 S.W.2d 756.

4. State v. Church, 199 Mo. 605, 98 S.W. 16; Doran v. Ross, supra, 240 Mo.App. 823, 221 S.W.2d 756; State v. McGee, 336 Mo. 1082, 83 S.W.2d 98, 106; State v. Garrett, 285 Mo. 279, 226 S.W. 4.

5. We note that it appeared on voir dire that a majority of the panel members had received a letter signed "The Reverend Doctor Merle E. Parker"; but the record does not show the content of this communication, and we cannot be concerned with it here. If it was an attempt by the defendant to influence the jury, the defendant may be subject to the imposition of procedures possibly more serious than the charge of common assault—but that is not this case. ·· :

the elisor. The fact that the regular panel had been summoned by the sherriff was no barrier to any or all of them being summoned for this particular case by the elisor; and, had this course been pursued, the fact that they had been previously summoned by the sheriff would have been no valid ground of objection to them. * * * But, in calling them into the jury box, the court deprived defendant of any supposed benefit that he had the right to expect at the hands of a jury summoned by an impartial officer. * * "

The Weeden case is cited with approval and the above portion is quoted in State v. Austin, supra, 183 Mo. 478, 82 S.W. 5, 1. c. 10. It was also cited with apparent approval in State v. Rouner, supra, 333 Mo. 1236, 64 S.W.2d 916, 92 A.L.R. 1099. In Orscheln v. Scott, 79 Mo.App. 534, it was held that no person could substitute for the coroner as elisor unless he, the coroner, was disqualified. The rule of the Weeden case seems to be highly technical, but it is the last decision which we find on this specific point. The sheriff *was* disqualified and the defendant *had* requested that the coroner summon a jury; and this point was preserved in the motion for new trial. We feel compelled to hold that not having the jury resummoned by the coroner was error.

One of appellant's contentions is that the verdict is against the weight of the evidence and the result of passion and prejudice because the state did not produce substantial evidence of the essential elements of the offense charged. The assignment in the motion for new trial states that the verdict is the result of bias and prejudice and is against the weight of the evidence. This assignment then proceeds to relate a condensed version of the state's evidence as to the acts which comprised the alleged assault. Obviously the assignment in the motion for new trial is aimed at the weight, rather than the sufficiency, of the evidence. The first question is, can we review this question?

The general rule is that evidence favorable to the verdict is taken as true; that all favorable inferences which may reasonably be drawn from the evidence are indulged; that credibility of witnesses is first for the jury and secondly for the trial court; and that the appellate courts will not pass on the weight of substantial evidence unless it appears that the trial court has abused its discretion.[6] Nevertheless, the appellate court has the power to weigh the evidence. The refusal to *weigh* is a matter of policy rather than that of authority, and if it be considered that the evidence for the state is "completely impeached" and the trial court's ruling was arbitrary, we will (in that sense) weigh and, if necessary, reverse.[7] Whether we may or may not weigh the evidence in order to determine whether there was complete impeachment, we choose not to do so in this case because in examination of the condensed version in the assignment in the motion for new trial our attention is immediately arrested by the question: Was this evidence sufficient to show that an assault was committed under the law? The assignment thus raises, although imperfectly, the question of sufficiency of the evidence. Criminal Rule 27.20(c), V.A.M.R., provides that plain errors affecting substantial rights, although not raised or preserved, or defectively raised or preserved, may be considered when the court deems that manifest injustice or miscarriage of justice has resulted therefrom. State v. Brookshire, Mo.

6. State v. Truster, Mo., 334 S.W.2d 104; State v. Emrich, Mo., 250 S.W.2d 718, 725; State v. Bowman, Mo., 12 S.W.2d 51; State v. Miller, 318 Mo. 581, 300 S.W. 765; see cases in West's Digest, Vol. 9A Criminal Law ☜1159(2, 3, 4).

7. King v. Kansas City Life Ins. Co. (banc), 350 Mo. 75, 164 S.W.2d 458, and cases at footnote 3, p. 464; State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, 51; State v. Welton, Mo., 225 S.W. 965; State v. Prendible, 165 Mo. 329, 65 S.W. 559; State v. Huff, 161 Mo. 459, 61 S.W. 900; State v. Kelsay, Mo., 228 S.W. 754.

App., 355 S.W.2d 333; State v. Goodwin, Mo., 352 S.W.2d 614. Obviously if all the evidence and reasonable inferences to be drawn therefrom do not show that an offense was committed, i. e. that the acts shown do not constitute an offense, then a conviction for those acts, not an offense, would be a miscarriage of justice. For that reason we consider whether there is sufficient evidence to establish that an offense was committed.

Defendant is charged with assaulting Kelley Sallee by touching him in a rude and insolent manner. He is not charged under Sections 557.200, 557.210, or 557.220 RSMo, V.A.M.S., or with otherwise interfering with an officer. The restraint or "touching" which (under the testimony of Sallee) the defendant applied to the person of Sallee might, or might not, have been justified depending upon whether Sallee was then engaged in some duty or activity as an officer, or whether he was then engaged, or about to engage, in some unlawful act as Kelley Sallee, a person. Was Sallee engaged in attempting to arrest Gene Billingsley?

An officer has the right to arrest without warrant if he has reasonable grounds to believe the arrestee has committed a felony. Except under certain circumstances, with which we are not here concerned, he has the right to arrest without warrant for a misdemeanor only when the misdemeanor is committed in his view or presence.[8] If these conditions do not exist, the attempt to arrest (if it is an arrest) is unlawful,[9] and the supposed arrestee has the right, within reasonable limits, to resist;[10] and, if the officer so engaged is using unreasonable and unnecessary force, one may go to the defense of the person so subjected to it to the extent necessary to protect against serious injury. State v. Browers, 356 Mo. 1195, 205 S.W.2d 721; Brouster v. Fox, 117 Mo.App. 711, 93 S.W. 318; see State v. McNail, Mo.App., 182 S.W. 1081.

Even if the arrest is otherwise lawful, the officer must give notice or make "reasonable disclosure adapted to the circumstances" to the person sought to be arrested so as to reasonably convey to that person the knowledge that arrest is sought and intended;[11] and, generally, he should also inform the person sought to be arrested of the object and cause of his arrest. 5 Am.Jur.2d, Arrest, § 71, p. 757; 6 C.J.S. Arrest § 6e, p. 602.

The prosecuting witness did not claim or accuse then, and the state does not claim now, that Gene Billingsley had committed either a felony or a misdemeanor. Sallee did not inform Billingsley that he was arresting him. He does not claim that Billingsley actually assaulted him and that he was defending himself after he came from the car and saw the tire and "it made me mad"—"well, I said I can take care of the dirty son-of-a-bitch that stuck that knife

8. State v. Dunivan, 217 Mo.App. 548, 269 S.W. 415, 417; State ex rel. Patterson v. Collins, Mo.App., 172 S.W.2d 284(15), and cases at 291; State v. McBride, 327 Mo. 184, 37 S.W.2d 423(5); State v. Jenkins, 321 Mo. 1237, 14 S.W.2d 624, 625; State v. Peters, Mo., 242 S.W. 894.

9. City of St. Louis v. Penrod, Mo.App., 332 S.W.2d 34; State ex rel. and to the Use of Donclon v. Deuser, 345 Mo. 628, 134 S.W.2d 132; State v. McGehee, 308 Mo. 560, 274 S.W. 70; State v. Burnett, 354 Mo. 45, 188 S.W.2d 51, 53; 357 Mo. 106, 206 S.W.2d 345.

10. Alexander, The Law of Arrest, Vol. 1, § 98, p. 494; State v. McGehee, supra,

308 Mo. 560, 274 S.W. 70, 72–73; City of St. Louis v. Penrod, supra, Mo.App., 332 S.W.2d 34; see State v. Burnett, supra, 354 Mo. 45, 188 S.W.2d 51; 357 Mo. 106, 206 S.W.2d 345; Satterwhite v. State, 112 Tex.Cr.R. 574, 17 S.W.2d 823; State v. Mobley, 240 N.C. 476, 83 S.E.2d 100.

11. 5 Am.Jur.2d, Arrest, § 70, p. 756; Alexander, The Law of Arrest, § 93, p. 479; 6 C.J.S. Arrest § 6e, p. 602; Gray v. Earls, 298 Mo. 116, 250 S.W. 567(2), and cases at 572; State v. Nolan, 354 Mo. 980, 192 S.W.2d 1016, 1020; see State v. Rollins, 226 Mo. 524, 126 S.W. 478.

in my car." Giving the prosecuting witness's own story the benefit of every intendment, we find that he and Billingsley went toward each other, but Billingsley had made no overt act except, in the words of prosecuting witness, "he *began* to double up his fists." The *best* we can make out of it from *Sallee's* story is that here were two men willing to fight, one with his fists, the other with a blackjack. In State v. Clayton, 100 Mo. 516, 13 S.W. 819, 18 Am.St. Rep. 565, it was said at 13 S.W. 820:

"* * * There was no testimony whatever that Allen was acting in his official capacity, as a peace-officer, in trying to effect the arrest of the defendant, at the time the assault was made; and, certainly, because he was such an officer gave him no greater rights than any other citizen, when engaged in a mere personal encounter. Indeed the testimony of Kinney rather seems to show that Allen himself was the assaulter, instead of the party assaulted. * * * In this latitude, at least, we have not yet reached the point where 'there's such divinity doth hedge' an official that he is exempted from the operation of the ordinary laws of the country. As to those laws, he occupies just the same position as the humblest citizen,—no better and no worse. It is only where an officer is actually engaged in performing some official duty that the law throws around him its 'special protection,' and not otherwise or elsewhere. * * *"

It is our conclusion that Kelley Sallee was then acting only in the position of a private citizen then engaged, or about to engage, in an affray.

Under the circumstances, was the defendant's act in taking hold of Sallee's arm (as Sallee says) and stating, "I'm making a citizen's arrest for you swearing in public," an assault? By common definition, to constitute an assault there must be an "unlawful force," an intentional unlawful offer of bodily injury to another under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented. 6 C.J.S. Assault and Battery § 57, p. 913; State v. Higgins, Mo.App., 252 S.W.2d 641; State v. Lynn, Mo.App., 184 S.W.2d 760.

The word "arrest" comes from the French word *arreter* which means to stop, detain, hinder, or obstruct. One of the purposes of arrest is the restraining or detaining of a person in order to prevent the commission of a crime. Alexander, The Law of Arrest, Vol. 1, § 45, p. 353. The private citizen is limited in the power of arrest; but he does have the right, without warrant or other process, to arrest for certain crimes, such as the commission of a felony or the commission of petit larceny in the presence. But he should be sure both of the crime and of the person. Pandjiris v. Hartman, 196 Mo. 539, 94 S.W. 270; Wehmeyer v. Mulvihill, 150 Mo.App. 197, 130 S.W. 681; see State v. Parker, 355 Mo. 916, 199 S.W.2d 338, 340. All authorities seem to agree that a private citizen has the right (where not abrogated by statute) to arrest in order to prevent a breach of peace or an affray.[12] We know of no statute which abrogates this right of the citizen in this state.

As we have said, Sallee was engaged, or about to engage, in a breach of

12. Restatement of the Law, Torts, § 141, p. 327; 5 Am.Jur.2d, Arrest, § 34, p. 726; 6 C.J.S. Arrest § 8c, p. 607; Wharton's Criminal Law and Procedure, Vol. 4, § 1603, p. 261; Cooley on Torts, 3d ed., § 203, p. 306; Carroll v. United States (Mich.), 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, 39 A.L.R. 790, 802; Woods v. State, 152 Tex.Cr.R. 338, 213 S.W.2d 685; Rich v. Bailey, 123 Ky. 827, 97 S.W. 747, 748; Lima v. Lawler, D.C. Va., 63 F.Supp. 446, 451; Palmer v. Maine Cent. R. Co., 92 Me. 399, 42 A. 800, 803, 44 L.R.A. 673; Baltimore & O. R. Co. v. Cain, 81 Md. 87, 31 A. 801, 803, 28 L.R.A. 688.

the peace or an affray. Again according to his testimony, he had used the words "son-of-a-bitch" in an angry manner. We are not an authority on whether "swearing" is considered by the general public to consist only in taking the Lord's name in vain. Certainly in Southern Missouri the words "son-of-a-bitch" when used in an angry manner are considered as "fighting words" and a breach of the peace likely to produce a more violent breach. The touching of the arm, or the taking hold of the arm, was not accompanied by any other force or threat. It was but a temporary, almost momentary, restraint which we believe the defendant had a right as a citizen to impose under the circumstances. This being true, no assault was committed. Accordingly, the judgment of conviction is reversed and the defendant is ordered discharged.

STONE and HOGAN, JJ., concur.